George H. W. BUSH et al., Plaintiffs,

v.

Crawford MARTIN, Secretary of State of the State of Texas, John Connally, Governor of the State of Texas, Waggoner Carr, Attorney General of the State of Texas, et al., Defendants.

Civ. A. No. 63–H–266.

United States District Court
S. D. Texas,
Houston Division.

Oct. 19, 1963.

Judgment Affirmed March 2, 1964.
See 84 S.Ct. 709.

Noel, District Judge, dissented.

502

William B. Cassin, Thad Grundy and Hart Mankin, Houston, Tex., for plaintiffs.

Albert P. Jones, First Asst. Atty. Gen., of Texas, Austin, Tex., for Martin, Connally and Carr, defendants.

Joe Resweber, Houston, Tex., Charles F. Mitchell, Houston, Tex., for William M. Elliott, County Judge, and R. E. Turrentine, Jr., County Clerk of Harris County, Texas.

Patrick B. Gibbons III, Dallas, Tex., for O'Donnell.

Heath & Davis, Will D. Davis, Austin, Tex., for Locke.

Glenn R. Lewis, San Angelo, Tex., amicus curiae.

Before BROWN, Circuit Judge, and INGRAHAM and NOEL, District Judges.

JOHN R. BROWN, Circuit Judge.

This is a frontal assault upon the constitutionality of Texas Statutes apportioning the Congressional Districts among the counties and citizens of the State of Texas. The Plaintiffs are qualified electors and taxpayers from the 8th and 22nd Congressional Districts, respectively. The Defendants comprise three major categories. The first, and principal, group are high executive officers of the State, the Secretary of State, the Governor, and the Attorney General.[1]

1. The Complaint charges and the law reflects that each is charged with major responsibilities for the conduct of primaries and elections in Texas and the three comprise in effect the Election Board. See, e. g., as to the Secretary of State Tex.Civ.Stat.Ann., Election Code arts. 1.03; 1.04; 7.14, §§ 1, 19; 8.37; 8.38; 8.44 (Vernon 1952) [hereinafter cited Election Code (Vernon )];

Election Code art. 13.34 (Vernon Supp. 1962); cf. Tex.Civ.Stat.Ann. art. 194a (Vernon 1959). See, e. g., as to the Governor Election Code arts. 4.01; 4.09, § 7; 9.26; 8.39; 8.45 (Vernon 1952); Election Code art. 6.07 (Vernon Supp. 1962). As the Chief Executive Officer of the State, the Governor has authority to call special sessions of the Legislature and has the duty to "cause the

The second group comprises the duly elected qualified and acting Chairman of the Executive Committees of the Democratic and Republican Parties, respectively.[2] The third group is made up of the County Judge and the County Clerk of Harris County (comprising Congressional Districts 8 and 22), each of whom is sued individually [3] and, it is claimed, as a representative of all other County Judges and County Clerks in the State of Texas similarly situated under F.R.Civ.P. 23.[4]

laws to be faithfully executed." Tex. Const. art. 4, §§ 1, 8, 9, 10, Vernon's Ann.St. As to the Attorney General see, e. g., Election Code arts. 8.38, 9.02 (Vernon 1952). Additionally the Attorney General is required to be served by both 28 U.S.C.A. § 2284(2) and Tex.Civ.Stat. Ann. art. 2524—1, § 11 (Vernon 1951).

2. These officials have crucial and major responsibilities in the holding and conduct of primaries and elections. See, e. g., Election Code arts. 13.23, 13.25 (Vernon 1952); Election Code arts. 13.-12, 13.15, 13.27, 13.34, 13.35, 13.36 (Vernon Supp.1962). Under the Election Code, candidates for the respective offices are nominated by direct primaries (and by run-off primaries when needed). A political party whose nominee for Governor in the last preceding general election received as many as 10,000 and less than 200,000 votes may nominate candidates for state offices and for United States Senator at a State Convention. Election Code art. 13.45 (Vernon Supp. 1962). Such party may nominate candidates for state, district, and county offices under the provisions of the Election Code relating to the conduct of primary elections. Election Code art. 13.45 (Vernon Supp.1962).

3. These officers likewise have a number of functions to perform. As to County Judges see, e. g., Election Code arts. 1.03, 4.01, 4.05, 7.07, 8.30, 8.36, 8.37, 8.43, 8.44, 13.04 (Vernon 1952). As to County Clerks see, e. g., Election Code arts. 1.03, 7.07, 8.15, 8.25, 8.29, 8.32, 13.23, 13.28, 13.31, 13.32 (Vernon 1952); Election Code arts. 5.05, 7.14, 13.24, 13.34 (Vernon Supp.1962); Tex.Civ.Stat.Ann. art. 3026a (Vernon 1952); Tex.Civ.Stat. Ann. art. 3158a (Vernon Supp.1962).

4. The named Defendants, County Clerk and Judge, respectively, of Harris County, deny that under F.R.Civ.P. 23 they

## I.

The immediate objective of the constitutional attack is Art. 197a, Tex.Civ.Stat. Ann., which apportions the Congressional Districts among the counties and citizens of the State of Texas.[5] Jurisdiction of the case rests on 28 U.S.C.A. § 1343 and 42 U.S.C.A. §§ 1983, 1988, as a suit to redress the deprivation of Federal constitutional rights. A special statutory Three-Judge Court was constituted under 28 U.S.C.A. § 2281. Injunctive as well

either are, or can be, representative of the class of County Clerks and County Judges throughout the State. Although the nature of their duties is such that they are proper parties with respect to elections to be held in Harris County, we need not determine whether they may be sued as representative Defendants since effective relief is available by injunctive or declaratory orders against the Governor, the Secretary of State, and the Attorney General.

5. Neither the Texas Constitution nor Statutes prescribe any standard for Congressional apportionment. Art. 197a (Tex.Acts 1957, ch. 286, at p. 681) provides:

"Section 1. The State of Texas shall be apportioned into the following Congressional Districts, each of which shall be entitled to elect one (1) Member of the Congress of the United States:
* * *

[here follows the description of the "First," "Second," through "Twenty-Second" Districts specifying the counties comprising each District.]
* * * * *

"Sec. 2. Nothing in this Act shall in any wise affect the tenure in office of the present delegation in Congress of Texas, but this Act shall take effect for the General Election in 1958, and thereafter until this law shall have been changed by the Legislature of this State."

Apportionment Acts were enacted (and so far as we have been advised in substantially this form) in 1873, 1882, 1892, 1901, 1909, 1917, and 1923. Tex.Acts 1874, art. 5811a, 5811b (Paschal); Tex. Acts 1882, ch. 13, at 9; Tex.Acts 1892, tit. 4, art. 16 (Sayles); Tex.Acts 1901, 1st Called Sess. ch. 5, at 7; Tex.Acts 1909, ch. 86, at 156; Tex.Acts 1917, ch. 119, at 311; Tex.Acts 1933, ch. 135, at 344.

as declaratory relief is sought. 28 U.S.C.A. §§ 2201 (declaratory judgment), 2202 (injunction).

This case is one of many following in the wake of the celebrated decision in Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663; cf. Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, modifying and remanding N.D.Ga., 1962, 203 F.Supp. 158. Because it bears on a specific contention urged with great vigor by Defendants, it is appropriate here to note that Baker v. Carr is not the last word. It is only the latest word, and more are bound to follow.[6]

■ As we consider the serious legal problems presented, we do so on the basis of a record that is substantially without contradiction. The case was first the subject of informal and formal pretrial hearings in which all issues were delineated so that all parties could offer all evidence thought relevant. Thereafter the case was heard on evidence which is primarily documentary and statistical in nature, the accuracy of which was for all practical purposes stipulated. Except for that authenticating one map, the only oral testimony was that offered by the Defendants. These witnesses were the respective Chairman of the Texas House and Senate Committees on Legislative and Congressional Apportionment. This testimony will be discussed later at some length as it bears on the need for judicial

6.

| | | | Congressional Reapportionment | | | |
|---|---|---|---|---|---|---|
| 1963 Supreme Court Docket No. | Citation to U.S.L.Week | | Name | Lower Court Citation F.Supp. | | Supreme Court Action |
| | Vol. | Page | | Vol. | Page | |
| 22 | 31 | 3147 | Wesberry v. Sanders | 206 | 276 | PJN* |
| 96 | 31 | 3355 | Wright v. Rockefeller | 211 | 460 | PJN |
| 267 | 32 | 3062 | Honeywood v. Rockefeller | 214 | 897 | |
| 381 | 31 | 2305 | Meyers v. Thigpen | 211 | 826 | |
| 476 | 32 | 3103 | Williams v. Moss | ** | | |
| | | | State Apportionment | | | |
| 20 | 31 | 2121 | W.M.C.A., Inc. v. Simon | 208 | 368 | PJN |
| 23 | 31 | 3147 | Reynolds v. Sims | 208 | 431 | PJN |
| 24 | 31 | 2059 | Beadle v. Scholle | *** | | |
| 27 | 31 | 3157 | Vann v. Frink | 208 | 431 | PJN |
| 29 | 31 | 3173 | Maryland Committee for Fair Representation v. Tawes | **** | | PJN |
| 41 | 31 | 3197 | McConnell v. Frink | 208 | 431 | PJN |
| 69 | 31 | 2263 | Davis v. Mann | 213 | 577 | PJN |
| 297 | 32 | 3086 | Swann v. Adams | 214 | 811 | |
| 307 | 32 | 3086 | Roman v. Sincock | 215 | 169 | |
| 454 | 31 | 2305 | Meyers v. Thigpen | 211 | 826 | |

 * PJN—Probable jurisdiction noted.
 ** Summarized 32 U.S.L.Week 2077.
 *** Reported 367 Mich. 176, 116 N.W.2d 350.
 **** Summarized at 31 U.S.L.Week 2155.

Besides these there have been a number of other apportionment cases. E. g., Clark v. Carter, E.D.Ky., 1963, 218 F.Supp. 448; League of Nebraska Municipalities v. Marsh, D.Neb., 1962, 209 F.Supp. 189; Wisconsin v. Zimmerman, W.D.Wis., 1962, 209 F.Supp. 183; Toombs v. Fortson, N.D.Ga., 1962, 205 F.Supp. 248; Sanders v. Gray, N.D.Ga., 1962, 203 F.Supp. 158.

relief and the nature of the remedy, if any, to be afforded. For the present it suffices merely to state that this testimony does not reflect any historic, geographic, economic or sociological justifications for the disparity in the population of the respective Congressional Districts.[7] The disparity is indeed spectacular. It runs from a low of 216,371 for District 4 to 951,527 for adjoining District 5.[8] The State average, in contrast, is in the neighborhood of 415,000 to 435,000.[9] Not surprisingly, the marked excesses over the State average are found primarily in the ever-expanding metropolitan areas of Houston, Dallas, San Antonio, and Fort Worth.[10] But the disparity is not confined to the cities. Three Districts, Nos.

7. Pursuant to the statement transmitted to Congress by the President following the publication of the 1960 decennial census of the population, Texas with its population of 9,579,677 is entitled to 23 Congressmen. 2 U.S.C.A. § 2a. Because Art. 197a note 5, supra, apportions the state into 22 Districts, the 23rd Texas Congressman was elected at large in the 1962 elections. 2 U.S.C.A. § 2a(c) (2).

8. Population per Congressional District under Art. 197a based on 1960 census:

| District | Population |
|---|---|
| 1 | 245,942 |
| 2 | 420,402 |
| 3 | 293,942 |
| 4 | 216,371 |
| 5 | 951,527 |
| 6 | 248,149 |
| 7 | 265,629 |
| 8 | 568,193 |
| 9 | 498,775 |
| 10 | 353,454 |
| 11 | 322,484 |
| 12 | 538,495 |
| 13 | 326,781 |
| 14 | 539,262 |
| 15 | 515,716 |
| 16 | 573,438 |
| 17 | 287,889 |
| 18 | 363,596 |
| 19 | 424,774 |
| 20 | 687,151 |
| 21 | 262,742 |
| 22 | 674,965 |
| At Large | (State Total) |
| Total | 9,579,677 |

9. The average is 435,000 if the total population is divided by 22 Districts; it is 415,000 if the total is divided by 23 (22 plus state at large).

10. The Districts comprising these metropolitan areas are:

| District | County | Metropolitan Area | District Population |
|---|---|---|---|
| 5 | Dallas | Dallas | 951,527 |
| 8 | Harris | Houston | 568,193 |
| 22 | " | " | 674,965 |
| 12 | Tarrant | Fort Worth | 538,495 |
| 20 | Bexar | San Antonio | 687,151 |
| | | | 3,420,331 |

14, 15 and 16 are aggregations of large area and large numbers of people.[11] In this malapportionment, Texas, with its District No. 5 (Dallas metropolitan area), has the distinction of the largest single Congressional District in the Nation.[12] The ratio between the District of the highest population and that of the lowest is 4.4 to 1. The highest District is 128.5% larger than the State average (see note 9, supra); the lowest District is 48.1% smaller than the average.

From 1874 on this disparity is the greatest. From 1874 to 1940 the relationship between the highest and lowest district remained fairly constant, the ratios ranging from a low 1.3 to 1 to a high 1.9 to 1. By 1950 the ratio had climbed sharply to 3.6 to 1. Alleviated only momentarily and then only partially by the Reapportionment Act of 1957, Acts 1957, p. 681, the ratio reached the new and present peak of 4.4 to 1 under the 1960 census.[13]

11.

| District | Population |
|----------|-----------|
| 14 | 539,262 |
| 15 | 515,716 |
| 16 | 573,438 |

District 16 with El Paso as the westernmost anchor comprises 19 counties having a total area of 42,607 square miles, 375 miles long and 231 miles wide. District 21, contiguous to District 16 on the east, has a meager population of 262,742.

12. See the Table in Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, 281. This is one of the cases accepted for argument by the Supreme Court, see note 6, supra.

13. The ratios and percentages of the highest to the lowest Districts from 1874 to the present are as follows:

| (1) | (2) | (3) | (4) | (5) | (6) Ratio | (7) Percentage | (8) |
| | | State | Highest | Lowest | Highest | Above | Below |
| Act | Census | Average | District | District | to Lowest | Average | Average |
|-----|--------|---------|----------|---------|-----------|---------|---------|
| | | | **1874 through 1933** | | | | |
| 1874 | 1870 | 136,429 | 158,556 | 99,467 | 1.6:1 | 16.5% | 27.1% |
| 1882 | 1880 | 144,704 | 157,942 | 121,573 | 1.3 | 9.1 | 16 |
| 1892 | 1890 | 172,374 | 210,907 | 139,909 | 1.5 | 22.4 | 18.8 |
| 1901 | 1900 | 190,544 | 225,194 | 144,431 | 1.6 | 18.2 | 24.2 |
| 1909 | 1900 | 190,544 | 220,322 | 144,431 | 1.5 | 15.6 | 24.2 |
| 1917 | 1910 | 216,475 | 292,074 | 156,041 | 1.9 | 34.9 | 27.9 |
| 1917 | 1920 | 259,068 | 349,859 | 211,032 | 1.7 | 35 | 18.5 |
| 1933 | 1930 | 277,368 | 359,328 | 210,621 | 1.7 | 29.5 | 24.1 |
| | | | **1934 through 1960** | | | | |
| 1933 | 1940 | 305,468 | 528,961* | 230,010 | 2.3 | 73.2 | 24.7 |
| 1933 | 1950 | 350,509 | 806,701* | 266,739 | 3.6 | 130.2 | 35.3 |
| 1957 | 1950 | 350,509 | 614,799# | 227,735 | 2.7 | 75.4 | 35.0 |
| 1957 | 1960 | 416,508 | 951,527# | 216,371 | 4.4 | 128.5 | 48.1 |

* District 8—Houston (Harris County)
# District 5—Dallas (Dallas County)

The only significant change in the 1957 Act was to give Harris County (Houston) two Congressmen, splitting former District 8 into two Districts (8 and 22).[14] This left Dallas County (Dallas) the target of greatest discrimination, the effect of which has gotten only worse as time, tide, population explosion and shifts go on.[15] The figures also show that although District 5 (Dallas) suffers the most, it is by no means alone. There are substantial disparities as to Districts 8 and 22 (Houston), District 12 (Fort Worth), District 20 (San Antonio), and the El Paso-anchored District 16 (see note 10, supra.)[16]

Thus it is seen that only once since 1933 has Texas made any reapportionment. And when this was done in 1957, only one significant change was made. (See note 14, supra) And so far as this record reflects and our own research has indicated, the unsuccessful efforts to deal with the problem are confined to the proposed reapportionment in the 1963 regular session. This effort took the form of House Bill 871, 58th Legislature, Regular Session 1963, which was passed by the House and sent to the Senate on April 4, 1963. On May 22, 1963, the Senate passed its Committee Substitute for H.B. 871 and sent it to the House. On May 24, 1963, the House refused to concur in the Senate amendments and requested the appointment of a Conference Committee to consider the differences between the two Houses. The Legislature then adjourned sine die on May 24, with no Conference Committee meeting having been held. The testimony of the two legislative witnesses indicates that the most immediate reason for inaction was the lateness of time in the Session and the virtual impossibility of securing enactment of any legislation on such a matter of widespread interest in such short a time. Part of the problem also was, they testified, the absence of any "guidelines" from the United States Supreme Court concerning the prospective legal and constitutional obligations of State Legislatures under the teaching of Baker v. Carr. Other stumbling blocks briefly elucidated by these witnesses concerned adjustment in size and population of District 16 (see note 11, supra), especially in relation to reshuffling of contiguous adjacent counties from other Districts in any split or rearrangement plus the not unnatural regional jealousy between some of the east and northeast Districts and this one covering so much of the western end of the State. We find it unnecessary to examine into or undertake the difficult task of assaying what reasons for this legislative inaction were or were not significant. Accepting as we readily do all that these witnesses testified to, we think this unsuccessful effort is of little final consequence since on its face it did not even begin to provide a reasonably equal reapportionment. Although changes were made in all but 5 Districts, the long existing disparities as

14. Out of 22 Districts, 12 remained exactly the same and the changes in the others varied from a maximum of 60,000 plus or minus down to approximately 20,000 plus or minus.

15.

| Act | Census | State Average | Dallas (District 5) | Lowest District | Ratio |
|---|---|---|---|---|---|
| 1957 | 1950 | 350,509 | 614,799 | 227,735 | 2.7:1 |
| 1957 | 1960 | 416,508 | 951,527 | 216,371 | 4.4:1 |

16. The ratio of each of these to the lowest District (Dist. 4 totaling 216,371) is:

| District | City | Population | Ratio |
|---|---|---|---|
| 8 | Houston | 568,193 | 2.6:1 |
| 22 | " | 674,965 | 3.1:1 |
| 12 | Fort Worth | 538,495 | 2.5:1 |
| 16 | El Paso Area | 573,438 | 2.6:1 |
| 20 | San Antonio | 687,151 | 3.2:1 |

to the San Antonio, Fort Worth, and El Paso Districts were left substantially undisturbed.[17] Of course the House proposal represented some improvement. The smallest District under the House Bill was 295,395 (District 3) as opposed to 216,371 (District 4 under Arts. 197a). However there were still 8 Districts having a population less than 350,000 (substantially under the State average of 416,508), and as previously noticed, the metropolitan areas of Dallas, Houston, Fort Worth, and San Antonio still suffered marked underrepresentation along with El Paso-based District 16.[18]

The Senate version was even less satisfactory. Thirteen Districts were not changed at all (from the composition under Tex.Civ.Stat.Ann. art. 197a), and, as in the House version, San Antonio, Fort Worth, and the El Paso Area were given no relief (other than the 9,109 per-

17. Under H.B. 871 the State was reapportioned into 23 Districts to care for the added Congressman after the 1960 census (except for Dists. 5, 8, 12, 16, 20, 22 the Districts were extensively reshuffled and renumbered):

| District | Population |
|---|---|
| 1 | 423,511 |
| 2 | 378,141 |
| 3 | 295,395 |
| 4 | 317,611 |
| 5 | 512,973 |
| 6 | 357,897 |
| 7 | 345,239 |
| 8 | 568,193 |
| 9 | 408,477 |
| 10 | 342,976 |
| 11 | 330,972 |
| 12 | 538,495 |
| 13 | 322,029 |
| 14 | 339,266 |
| 15 | 352,086 |
| 16 | 564,329 |
| 17 | 305,814 |
| 18 | 363,596 |
| 19 | 408,556 |
| 20 | 687,151 |
| 21 | 303,451 |
| 22 | 674,965 |
| 23 | 438,554 |
| | 9,579,677 |

Although Dallas was split into 2 Districts (5 and 23), San Antonio (District 20—687, 151) and Fort Worth (District 12—538,495) were not changed at all; and the only relief afforded El Paso (District 16) was a reduction of 9,109 from 573,438 to 564,329.

18.

| District | | Population | Ratio To Lowest District (District No. 3) |
|---|---|---|---|
| 5 | Dallas | 512,973 | 1.7 |
| 23 | " | 438,554 | 1.5 |
| 8 | Houston | 568,193 | 1.9 |
| 22 | " | 674,965 | 2.3 |
| 12 | Ft. Worth | 538,495 | 1.8 |
| 20 | San Antonio | 687,151 | 2.3 |
| 16 | El Paso | 564,329 | 1.9 |

son reduction in the size of the El Paso District noticed above).[19]

It rounds out the historical-statistical picture to point out that although Baker v. Carr was announced on March 26, 1962, and, in Texas as elsewhere, was a well known fact in contemporary constitutional development, no action toward congressional apportionment was taken by convening a special session of the Legislature thereafter in 1962.[20] The legislative witnesses testified that in the 1961 Session the Legislature was preoccupied entirely with the equally troublesome problems of state legislative reapportionment as to both the House and Senate. It is interesting to note here that in contrast to the entire absence of either Texas constitutional or legislative standards for congressional apportionment, the Texas Constitution is emphatic as to both Houses of its Legislature. With the only difference being the one of little contemporary present significance in these days of virtual universal suffrage by a distinction between population and qualified electors, the Texas House [21] and Senate [22] are

---

19. Except for splitting Dallas County into 2 Districts (Dists. 5 and 23), the Senate Committee substitute for H.B. 871, working on the structure of Art. 197a (rather than the renumbered, reshuffled Districts in H.B. 871), shifted only 112,640 persons:

Population

| District No. | Art. 197a | Senate Committee Substitute | Increase | Decrease |
|---|---|---|---|---|
| 1 | 245,942 | 253,791 | 7,849 | |
| 2 | 420,402 | 394,712 | | 25,690 |
| 3 | 293,942 | 286,093 | | 7,849 |
| 4 | 216,371 | 286,363 | 69,992 | |
| 7 | 265,629 | 291,319 | 25,690 | |
| 13 | 326,781 | 256,789 | | 69,992 |
| 16 | 573,438 | 564,329 | | 9,109 |
| 21 | 262,742 | 271,851 | 9,109 | |
| | | | 112,640 | 112,640 |

It is not surprising that the Senate Revision left 8 Districts with populations of less than 292,000.

---

20. The Third (and last) Called Session of the 57th Legislature adjourned Feb. 21, 1962.

21. Tex.Const. art. 3, § 26, provides:
"The members of the House of Representatives shall be apportioned among the several counties, according to the number of population in each, as nearly as may be, on a ratio obtained by dividing the population of the State, as ascertained by the most recent United States census, by the number of members of which the House is composed; * * *."
Under § 26a maximum representation for any county is seven unless population exceeds 700,000.
The present apportionment of Representatives to the Texas House is Tex.Civ. Stat.Ann. art. 195 (Vernon Supp.1962)

(Tex.Acts 1961, ch. 256, §§ 1, 2, at p. 544).

22. Tex.Const. art. 3, § 25, provides:
"The State shall be divided into Senatorial Districts of contiguous territory according to the number of qualified electors, as nearly as may be, and each district shall be entitled to elect one Senator; and no single county shall be entitled to more than one Senator."
The Senate is further limited. Art. 3, § 2, provides:
"The Senate shall consist of thirty-one members, and shall never be increased above this number. * * *"
The present apportionment of members of the Texas Senate is Tex.Civ.Stat.Ann. art. 193 (Vernon Supp.1962) (Tex.Acts 1961, ch. 256, § 4, at p. 544). It is interesting to note that, as in the case of

to be apportioned substantially in relation to population.[23]

## II.

■■ This quantitative analysis then brings us to the legal questions which the case so seriously presents. Some by now are greatly simplified if not altogether eliminated. The first is the problem of subject matter jurisdiction. Akin to this is the question of justiciability—or to put it in its opposite—it is the reflex of the much mooted label of a "political" question. Both of these matters were put to rest finally and completely by Baker v. Carr. To this extent, at least, we concur with the majority in Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276. By an intricate reconstruction of that 3–1–3 decision rendered by what Justice CLARK called a "bobbed tailed court," Baker v. Carr, 1962, 369 U.S. 186, 252, 82 S.Ct. 691, 7 L.Ed.2d 663, (concurring opinion), the majority concluded that Colegrove v. Green, 1946, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, was a holding that the question of congressional apportionment was justiciable. But this hardly solves our problem for as Wesberry v. Vandiver itself reveals, what is recognized as "justiciable" is held beyond effective judicial relief because, among other things, that Court says the question is one committed to the coequal branch of the Government, namely Congress, under Art. I § 4 of the Constitution. Con-

sequently, we must take some of these problems one at a time.

## III.

■ One on which there is presently little disagreement is the standard of equality. We accept the approach articulated in a number of cases [24] that the Supreme Court means to adopt the general guide of prohibiting "invidious discrimination." A good deal is wrapped up in this formula. An analysis of it involves subsidiary inquiries along the lines of whether the disparity is irrational. Shading off, or into, this standard is the problem of whether the disparity is arbitrary, capricious, wholly without reasonable foundation, and the like. In the end it perhaps comes back to the question whether there have been actual factors, or perhaps whether such factors can now be discerned though not previously articulated in formal Governmental fashion, which sustain or at least explain or in some measure justify the particular wide arithmetical inequality. The search for, and the assaying of, formally undisclosed factors may be important especially where, as is true in this record, neither the Texas Constitution nor its apportionment statutes prescribe any standards for congressional apportionment. We do think, however, that it is a corollary to this that "invidious discrimination" is something more than numerical disparity. The problem, in short, is more profound than that of arithmetic.

Art. 197a, the acts apportioning the Texas House and Senate members do not indicate in any manner the standard or process underlying the resulting apportionment; the Districts and the counties they contain are simply listed.

23. Pending now before this same Court is an action seeking declaratory and injunctive relief as to Texas legislative reapportionment. Any comments made herein contrasting the factors in the two cases are purely illustrative. Neither by what we say, or do not say, do we intimate even a remote suggestion of a predetermination of any of the issues in that proceeding.

24. Sims v. Frink, M.D.Ala., 1962, 208 F. Supp. 431, 436, probable jurisdiction noted, 374 U.S. 802, 83 S.Ct. 1692, 10 L.

Ed.2d 1029 (No. 508, 1962 Term; renumbered No. 23, 1963 Term); Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, 282, probable jurisdiction noted, 374 U.S. 802, 83 S.Ct. 1691, 10 L.Ed.2d 1029 (No. 507, 1962 Term; renumbered No. 22, 1963 Term); Toombs v. Fortson, N.D.Ga., 1962, 205 F.Supp. 248, 254; Sanders v. Gray, N.D.Ga., 1962, 203 F. Supp. 158, 168–170, modified and remanded, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821. Of course only the Wesberry case involves congressional apportionment, but we agree with the clear indication of the majority in that case that the standard of invidious discrimination applies equally as well to congressional apportionment as it does to legislative apportionment.

## IV.

While at times it may be difficult to really separate the question of "invidious discrimination" from that concerning the necessity for, or appropriateness of, a judicial remedy, we think that there can be no doubt that the disparity here spectacularly falls within that category.

In considering this aspect, we must not lose sight of the historical fact that goes back to the inception—indeed, the conception—of the Nation. This is revealed graphically by contrasting the problem with that of the composition of State Legislatures. The problem of the distribution of the legislative power, the machinery by which it operates, or the electors who establish it (see, e. g., notes 21, 22, supra), is essentially one of meeting the imperative demand of a republican form of Government under the Guaranty Clause of the Constitution, U.S. Const. art. IV, § 4. The present indications are that considerable leeway must be allowed to the States in the diffusion of its political initiative. See, e. g., Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, 827–828, especially the concurring opinion, 372 U.S. at 381–382, 83 S.Ct. at 809, 9 L.Ed.2d at 831; cf. Scholle v. Hare, 1962, 369 U.S. 429, 430–432, 82 S.Ct. 910, 911, 8 L.Ed.2d 2,

3–4. To put it another way, unless the State constitutional or legislative standards impose numerical equality as the predominate test and then under circumstances which elevate such local standards to a federally guaranteed right, a number of other elements may well be open besides population. These perhaps include geography, area, economic, social, topographical, sociological or political factors.

But here we deal with a legislative assembly which, by the Constitution [25] and because of the Great Compromise [26] giving rise to that Constitution, is to bear a direct relation to population, and, at least as between the States, population only. That the congressional articulation of that constitutional imperative—former 2 U.S.C.A. § 3 [27]—evaporated with the exhaustion of that law in 1929 [28] is not decisive. The simple constitutional fact is that so far as (a) the standard of composition of the Congress is concerned, as distinguished perhaps from (b) the standard governing the time and circumstance permitting or requiring judicial intervention, Members of Congress are to be elected on the basis of population and nothing else.[29]

We think it requires no extended discussion or analysis of the factual ma-

25. Art. I, § 2. "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualification requisite for Electors of the most numerous Branch of the State Legislature. * * * The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative * * *."
 Art. XIV, § 2. "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. * * *"

26. See Warren, The Making of the Constitution 141, 159, 163, 220–312 (1927); Padover, To Secure These Blessings, 152–88, 285–301 (1962).

27. 2 U.S.C.A. § 3. "In each States entitled under this apportionment to more than one Representative, the Representatives to Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of Representatives to which such State may be entitled in Congress, no district electing more than one Representative." Act of August 8, 1911, ch. 5, § 3, 37 Stat. 14.

28. The Federal legislation was traced in detail in Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, 278–279.

29. Of course the qualification of electors may produce a disparity between population and voters. But as was done in nearly all of the cases, see note 6, supra, we assume in our case that population statistics fairly represent the electorate.

terial of this record to conclude that this sort of discrimination exists here. Without even remotely suggesting that we hereby put an historical blessing on the ratios maintained up to 1940 (see note 13, supra), the trend since then as it is manifested in the contemporary climax is unacceptable. The relief afforded by the 1957 Act was both momentary and inadequate—largely because there was no real effort at reapportionment as such. What, and really all, that was done, was to provide Harris County (Houston) with an additional Congressman. But whatever the adequacies or inadequacies of that effort, the ever expanding population of Texas has thrown the whole thing out of kilter. The Defendants neither justify nor claim to be able to find any legal justification for continuation of these disparate ratios running now as high as 4.4:1. Though we discuss it more in detail later, it is appropriate here to point out that injunctive relief against only portions of Art. 197a, that is as to particular Districts (e. g., 5, 12, 16, 20, etc.) would be unworkable and unjust. To alleviate these startling discriminations, it is simply necessary to reapportion the State as a whole.

### V.

The much more troublesome problem is this. Granting the existence of invidious discrimination, jurisdiction and justiciability, is this case in its present posture one that either requires or admits of coercive judicial relief? This notion may be variously described. To the familiar label of "want of equity" with which Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, was so preoccupied, the Defendants urge additional facets. In elaboration of the argument that since under Art. I, § 4, Congress has the power ultimately to regulate congressional districting, it is therefore a matter left to determination by a coequal branch of the Government, the Defendants specifically assert that the case should be abated, if not dismissed, since the Plaintiffs stipulate that they have not sought congressional relief. Additionally, the Defendants assert as a separate express defense

that no action should be required under the pressures of a coercive judicial order until such time as the Supreme Court establishes workable and understandable guidelines. In connection with the latter, they naturally, and properly, emphasize the uncontradicted fact that the Supreme Court has accepted for argument and determination a great number of cases (see note 6, supra) bearing directly on this problem.

We think all of these contentions may be discussed together. At the outset, we are certainly in agreement with the Defendants that much is to come from the Supreme Court decisions in these pending cases. The decisions cannot help but be informative, if not decisive, as the District Courts "on the front line," see Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, 790, undertake this recently imposed serious judicial function. Of course one of the cases could be dispositive. If the Supreme Court affirms Wesberry v. Vandiver, N.D.Ga., 1962, 206 F.Supp. 276, and approves what we conceive to be the rationale of Judge Bell's opinion for that Court, it would, in effect, be a declaration that congressional apportionment must be left to the respective State Legislatures unfettered by anything that a Federal Court may do with the only ultimate relief being from Congress. If that result transpires, then no action would be authorized in our case.

We cannot, therefore, escape the uncomfortable responsibility of determining as our lights reveal, whether the decision in Wesberry v. Vandiver is correct and will in all probability be sustained or whether, on the other hand, the view expounded by Chief Judge Tuttle is not more nearly correct. With the greatest of deference, we align ourselves with the dissenting opinion of Judge Tuttle. When that Court as a whole recognized, as it does, that the discrimination in Georgia was "egregious" and yet the Court is powerless to do anything about it, it is to us the old shibboleth of nonjusticiability in a new cloak. The majority put predominant emphasis on the provision of Art. I, § 4, according to Con-

gress the power to grant ultimate relief against invidious discrimination. That, coupled with the action of that Court in dismissing, not merely deferring action, adds up, so far as we can understand that opinion, to the conclusion that there are hardly any circumstances under which the Federal Court could intervene to prevent denial of constitutional rights resulting from invidious discrimination in congressional apportionment.

In assaying the likely outcome of that case, we find the majority's intricate effort to analyze and reconstruct just what the Court did in Colgrove v. Green to be particularly unhelpful. Adding 3 and 1 does make 4, but we are unable to conclude that there was ever a majority constructed which held that although the case was justiciable and therefore a proper one for judicial relief, the case on its merits nevertheless was "wanting in equity."

 Of course the easy way out is either to take no action or formally to defer action pending decision by the Supreme Court on that case as well as others which may be illuminating. But this Court no less than the Supreme Court of the United States is charged with serious obligations under Art. III of the Constitution and under the implementing statutes of Congress to afford to litigants appropriate relief in vindication of constitutional and civil rights. We must therefore balance the relative advantages, disadvantages, the relative injuries to the parties, and perhaps even more so to the whole State of Texas.

If the Supreme Court concludes that equitable relief is not available to enjoin egregious, that is invidious, irrational, unreasonable, arbitrary, capricious, discrimination, then it indeed would be a great misfortune were this Court to enter a decree compelling immediate remedial action by Texas. There would be the great expense of a special session of the Legislature. More serious, that result would be out of keeping with the proper role of the Judiciary—certainly the Federal Judiciary in our Federalism. Legislative changes in a matter which is essentially legislative in nature ought not to be brought about, even on a contingent basis, by the coercive pressures of a Federal Court injunction. On the other hand, these Plaintiffs have established a clear case of discrimination. They, for themselves, and all other similarly situated and these we conclude encompass at least those in all Districts having substantial underrepresentation, lose valuable rights. Under the operation of the election machinery of Texas, the reapportionment must be accomplished by February 3, 1964. There can be no assurance that the Supreme Court will speak by that time. If authoritative decisions are not pronounced by that critical date, it will mean that thousands of Texas citizens throughout the State will suffer unconstitutional dilution of their power and right to vote for another two years. Relief, if it comes, will be effective then only as to congressional elections in 1966, nearly three years hence.

Bearing on these relative injuries to the respective parties and to the public generally, it is appropriate, of course, to keep in mind again the distinction between discrimination as to State Legislatures and discrimination in congressional districting. As the many cases (see note 6, supra) indicate, it is not uncommon for a small minority of the voters to be able to elect a majority of both Houses of State Legislatures. And in nearly every case so far the minority of the voters can elect a sufficient majority of the Legislators to effectually prevent amendments to the local Constitution either by referendum or convention. To this extent voters in underrepresented areas are directly denied an effective right to vote. On the other hand under the operation of the Federal Constitution and the implementing statutes, Texas as a whole gets all of its proper number of Congressmen. Since this is a National Legislature, the problems, while undoubtedly of frequent paramount local interest from time to time, are not nearly so localized as is true in the state legislative process. Likewise, it is much more difficult, if not impossible, to demonstrate that the voters

**514**

in the underrepresented Congressional Districts, as would be true of the voters in an underrepresented State legislative district, are outnumbered through a majority of Congressional Representatives elected by a minority of the population.

Despite these differences, we think the law is clear that the right to cast a vote in a primary or general election for Congressmen is a precious and constitutional right which ought not to be lost even for a period of two to three years merely on the possibility that the Supreme Court will recede so quickly from what we conceive to be the full reach of Baker v. Carr as to effectually close the doors of the Federal Courts to judicial prevention of marked invidious discrimination. Of course those relative risks, harms, injuries, advantages, or disadvantages must be carefully weighed. And they would prevail here were there a substantial belief in our minds that this would be the result in the forthcoming Supreme Court decisions. But even as to this, we do not foreclose interim relief against the impact of the orders which we will enter. For these orders will provide that their effectiveness is postponed for a specified period to enable the parties to secure from the Supreme Court or a Circuit Justice a stay of our order pending decisions in the cases now before it. That Court, and that Court alone, will be able to determine in the light of the cases pending before it what the likelihood of decision will be, both in terms of time and the probable nature and reach of the decisions to be rendered.

Rejecting, as we do, the argument elucidated and adopted in Wesberry v. Vandiver concerning the authority of a coequal branch to alleviate this discrimination we must deal with the other contentions. For reasons we need state only briefly, we think no other factors indicate any "want of equity."

The Defendants seem to suggest that judicial intervention at this stage necessarily implies the serious charge of lack of good faith on the part of Texas. True, they do not phrase it this way.

Rather, they couch it affirmatively to urge that the Legislature in 1963 made a good faith effort to correct the evil, and the mere fact that it failed to achieve success should not deprive it of the right to try—at least one more time—before the Judiciary acts. But our action is certainly not to be construed as any unseemly reflection upon the good faith, sincerity or conscientious acceptance of constitutional obligation on the part of the authorities of the State of Texas or its Legislators. We have emphasized the activities in the unsuccessful abortive efforts in 1963 not to demonstrate any lack of good faith or serious purpose. We have done it to show that so far there is nothing on the horizon to indicate that relief can be forthcoming through State legislative channels that will give these Plaintiffs and others similarly situated effective relief for the present time.

Conceding without reservation, as we do, the good faith of all officials of the State of Texas—including its Legislators—the determination of the question of the propriety of judicial intervention certainly permits an objective consideration of the recent actions of the Texas Legislature in terms of the probability of the disfranchised voters getting relief at its hands. This necessarily involves both a question of *time* and what might be described as the *substantive* approach.

As to the latter, there is little now to indicate that what the Defendants put forward as a formal defense—the necessity for Supreme Court guidelines—has really cut any figure. Texas has reapportioned many times in the past. On those occasions no guidelines were present other than those which were reflected in national legislation up to 1929 (see note 27, supra). The central factor in that Federal legislation was numerical equality. Although 2 U.S.C.A. § 3 had the added elements of contiguity and compactness, Texas has apparently always recognized this and even today the geographical configuration of the Districts is fortunately free from the invidious practice of gerrymandering. And even if Baker v. Carr was thought by Texas

political leadership to change the simple standard of numerical equality so far as practicable, there is nothing in the subsequent action of the Legislature to indicate either any quandary or effort to determine what the guidelines ought to be. Baker v. Carr had, of course, come down on March 26, 1962, and all Texas, as all America, was aware of it. The House Bill was introduced on March 7, 1963. While committee hearings were held in both the House and the Senate, the record indicates that the respective committees presumably took a passive approach. Following the usual practice, each merely waited for the appearance of witnesses. Neither of the committees undertook the affirmative task of attempting to ascertain what guidelines were or might be proper, what factors should or might be considered. Nor was there any effort, as in other places such as, for example, the study made under the direction of the New York Legislature, concerning this task of reapportionment.[30] The House passed H.B. 871 and sent it to the Senate on April 4, 1963. Bringing it even closer to home, while the matter was pending in the Senate, the case at bar was filed on April 23, 1963. And even though we can readily understand that when the Senate finally got around to passing a bill on May 22, 1963, it was then really too late to take any practical action in the closing days of a strenuous session of the Texas Legislature,[31] neither one or both of the Houses took any steps toward an interim determination of the proper standards. And this despite the fact that Texas has long had, and utilized to great advantage, the resources of the Texas Legislative Council. Established by law,[32] this is a valuable facility of the Legislature for the collection and assimilation of factual and other material for studies in depth on pressing public questions looking toward legislative or constitutional changes. Of course there is no right in a Federal Court to direct the Legislature or its subsidiary bodies to employ such facilities, and we do not even remotely imply such criticism here. But in determining whether equitable relief is reasonably essential at the present time because effective relief cannot be obtained elsewhere, it is en-

30. The following discussion of the interim report of the Joint Legislative Committee on Reapportionment submitted to the Second Extraordinary Session of the New York Legislature on November 1961 is taken from Wright v. Rockefeller, S.D. N.Y., 1962, 211 F.Supp. 460, 462–464. Under the statement transmitted to Congress by the President (pursuant to 2 U.S.C.A. § 2a) following the 1960 census, New York was entitled to 2 less Congressmen than it had been allotted under the 1950 census. As a result of this change, the committee submitted its report, stating that reapportionment was needed in order to prevent at-large elections of the New York delegation. The report then detailed the history of the Congressional district system and the absence of standards in the Constitution or statutes of New York. The report then set forth the standards used by it in drafting its proposed apportionment. With great clarity, the report concludes that "the most important standard [in congressional apportionment] is substantial equality of population." Recognizing that exact equality of population, although ideal, for practical reasons can never be obtained, it concluded that a permissible fair variation would be a maximum of 15 per cent, plus or minus. Finally, the report urged that, as an additional factor, districts be composed of contiguous territory and that metropolitan areas be preserved either in single districts or in contiguous and closely allied districts. As a specific example the report cites the situation regarding New York County (Manhattan) which, under its proposed apportionment, would receive approximately 1/10 of the Congressmen to match its 1/10 of the state's total population.

31. Of all the vexing problems bearing immediately on this specific subject, the Legislative witnesses stressed the regional rivalry between areas such as the El Paso-based District 16 and those in the northeastern part of the State. The problem is most spectacularly demonstrated by Districts 1, 4, and 13, which are immediately adjacent to District 5 (Dallas). These Districts have a total population of 789,094 or an average population of 263,031 in contrast to the 951,527 population of District 5 (Dallas).

32. Tex.Civ.Stat.Ann. art. 5429b (Vernon 1958).

tirely permissible, indeed our duty, to ascertain whether on the present showing there is a likelihood that it can be obtained through other means.

 Standing alone, the aspect just discussed would have perhaps only limited significance. But when we consider the element of *time*, it seems clear to us that there is no basis whatsoever for staying the hand of equity on the ground that relief can be elsewhere and otherwise obtained. Having known since April that this attack was being made and being aware of the failure of the Legislature to take any effective action toward its correction, the State-official-Defendants are not in a position to advance as a basis for postponing judicial relief the appealing defense: Let Us Work This Out. Had there been at any time since the adjournment on May 24, 1963, down through the pretrial stages of this case and its trial, any indication that the Governor would exercise his constitutional and statutory power [33] to convene a special session of the Legislature for the consideration of this pressing public problem, this Court without a doubt would unanimously withhold any action to afford full exploitation of these procedures. But this has not been done, nor do such Defendants ask that they be given an opportunity to do this. The defense is essentially that because of the absence of guidelines, the State ought not to incur the expense and difficulty of a special session only to legislate an Act which might itself have constitutional infirmities. To put it another way, the Defendants are urging that equity should await its hand until the Legislature next meets in regular session at which time, conscious of the imperative demands of the Federal Constitution as well as its own, Texas will respond by a proper apportionment act. Accepting this with no reservation as to good faith, it means that no matter how clear the deprivation of a constitutional right, there can be *no* legislative relief until after February 1964. This in turn means that there can be no relief prior to the congressional elections in 1966.

We credit fully the serious, sincere effort made in March–May 1963. But one pass is hardly enough. Certainly not when there are no sound reasons revealed why a second, or a third, or even a fourth effort has not been made, and to give up now postpones even the slightest hope of relief for another three years.

If that is "want of equity" we are unable to reconcile it with the full sweep of Baker v. Carr.

## VI.

 Having said this much, we do not go so far, however, as to undertake to apportion the State of Texas for Congressional Districts. Time is short, but there is still much time left. The job can be simple unless we labor to render it complex. It is sufficient in our judgment that we simply declare Art. 197a unconstitutional and by appropriate orders enjoin its enforcement.[34]

The consequence likely will be that unless interim legislation is passed, this will mean that all Congressmen would be elected at large, a result which all assume to be most unsatisfactory. But Texas is not without resources. It has shown a capacity throughout its colorful and productive history to take decisive action. Impressed as we are with the good faith of all of the Legislators as reflected by their two spokesmen, we believe that the infinite variety of legislative factors inherent in this problem can be hammered out in time for all Texans to have a vote for Congressmen undiluted and unfettered by unconstitutional discrimination, no matter what its source or origin.

Decree for plaintiffs.

33. Tex.Const. arts. 3, § 5; 4, § 8.

34. This is one of those rare cases in which declaratory relief alone would be unfair and even more harsh than an injunctive order. A mere declaration, without more, would leave State authorities in doubt as to what had to be done and, failing affirmative legislative action, would leave the validity of the 1964 elections under a considerable cloud.

## DECREE

This cause having come on for trial at which all parties were present by counsel and the Court having heard the evidence and having considered the pleadings, evidence and argument of counsel being of the view that a decree should be entered granting specified relief to the Plaintiffs for the reasons set forth in the Court's opinion filed this date, and to which Judge James L. Noel, Jr. dissents for the reasons set forth in his dissenting opinion filed therewith, it is therefore ordered, adjudged and decreed by the court:

*First:* The Court hereby declares that the present apportionment of Congressional Districts under Art. 197a Texas Civil Statutes Annotated (Vernon 1959) (Tex.Acts 1957, 55th Leg., ch. 286, at 681) is unconstitutional and therefore said Art. 197a is void and invalid in its application;

*Second:* In conducting primaries for nomination of candidates, and elections for the election of, Members of Congress from Texas, the named Defendants, individually and in their official representative capacity (but not as alleged representatives of a class of public officers), their respective agents, officers and employees, are hereby enjoined and restrained from enforcing, applying or following said Art. 197a;

*Third:* Pending enactment by the State of Texas of substitute legislation in the place of said Art. 197a, all Members of Congress for the State of Texas shall be nominated and elected from the State at large;

*Fourth:* This order shall not become effective until 11:00 A.M. the 1st day of November, 1963, in order to enable Defendants, or any one or more of them, to apply for and obtain a stay of this decree from the Circuit Justice, the Supreme Court, or any Justice thereof;

*Fifth:* The Court retains jurisdiction of the cause for such other and further orders as may be required.

INGRAHAM, District Judge (concurring specially).

I join in the court's opinion and the result but add this for emphasis.

We can expostulate about economic and cultural interests, ethnic groups, language,* acreage, scenery and the like until the world looks level. Such considerations extend across county, district, state and national boundaries. They offer no guidelines. They confuse, delay and avoid. Have we come to a denial, have we come to a breach of the Great Compromise, which has served us so long and so well, by which representation in the House of Representatives was to be based on population and representation in the Senate to be divided equally among the States.

NOEL, District Judge (dissenting).

### I. Preface

This being a trial court, it is well to state the chronology of significant events and the precise posture of the case from the standpoint of parties and pleadings. On April 23, 1963 plaintiffs filed their original complaint. Judge Ingraham, upon whose docket it fell, requested the Chief Judge of the Fifth Circuit Court of Appeals to designate the judges to sit with him on this requisite three-judge court, which was promptly done.

After summons issued, defendant executives of the State of Texas answered on May 13, the County Judge and County Clerk of Harris County on May 15, the Chairman of the State Republican Executive Committee on May 16, and the Chairman of the State Democratic Executive Committee on June 26.

On June 28, 1963, a preliminary pretrial conference was held which the writer attended. On July 17, 1963 the Chief Judge duly designated the writer a member of this Court.[1] The consensus of

---

* There is but one official language in Texas and the Nation, although some of our scholarly friends speak more.

1. Original order of designation by Chief Judge Tuttle dated April 25, 1963.

those present was that pre-trial and trial should be had as soon as practicable after Labor Day. The case was set and accordingly pre-tried on September 9, tried on September 23, 1963. All parties and the Court have given the case prompt attention.

In their complaint, plaintiffs assert their right to equal protection of the laws under the Fourteenth Amendment, Section I of the Constitution of the United States. Related rights are asserted under the Texas Constitution, Article 6, Sections 2 and 4, and Article 16, Section 2; and under the Texas Election Code, V.A.T.S. Election Code, Article 1.01 et seq. In some detail plaintiffs set forth the disparity in voting power and representation between various congressional districts in the State, and allege this to constitute invidious discrimination under the Equal Protection Clause of the Fourteenth Amendment as to them and the class they represent, all without any rational or historical basis or justification. Plaintiffs pray for the following relief: (a) a judgment declaring Article 197a, V.A.T.S. unconstitutional, void and invalid; (b) an injunction against all defendants, individually and in their representative capacities, from conducting primary elections for members of Congress under Article 197a; and (c) if a valid, lawful and constitutional reapportionment act is not adopted by the Texas Legislature before July 1, 1963, that the Court enter its own order reapportioning the congressional districts.

In answer, the Chairman of the State Republican Executive Committee agrees with the complaint and admits each and every allegation in the complaint, consenting to the relief prayed for by plaintiffs. The Republican Chairman thus aligns himself here with plaintiffs. In his answer, the Chairman of the State Democratic Executive Committee opposes the complaint. First, he says the complaint fails to state a claim upon which relief can be granted; and secondly, that the action should be dismissed for want of equity inasmuch as the complaint pre-sents a political question involving the authority of a coordinate branch of the federal government. The Democratic Chairman thus aligns himself with the defendant State executives.

The executives of the State, in their first amended original answer, assert four defenses. The first two are substantially identical with the first two defenses asserted by the Chairman of the State Democratic Executive Committee. Their second defense in the alternative is that the plaintiffs do not allege they have made any effort to secure relief through the enactment of legislation by the Congress of the United States of America. These defendants' third defense is that the suit should be abated because the establishment of congressional districts of the State of Texas is a lawful prerogative of the Legislature of the State. And fourthly, these defendants in substance deny that the plaintiffs are fairly representative of all voters of the State of Texas or that plaintiffs constitutional rights have been violated.

Defendants pray that the cause be dismissed; in the alternative, that it be abated until the plaintiffs have sought unsuccessfully redress from the Congress of the United States or until the Legislature of the State of Texas shall have had an opportunity to give consideration to the matter of congressional redistricting in light of the rules established by the Supreme Court of the United States; and further in the alternative, in the event the cause is neither dismissed nor abated, for judgment denying plaintiffs the relief sought, and for other appropriate relief.

Defendants County Judge and County Clerk of Harris County, Texas, answer for themselves only and not for any class. They deny the representative capacity in which they are sued and suggest the possible conflict of interest between themselves and the interests of others of their alleged class. They request the Court to accept jurisdiction of the case and declare the rights of the parties in accordance with the applicable law and facts proven.

Plaintiffs did not pursue the alleged violations of their rights under the Texas Constitution or laws at trial. The Majority made no reference to such allegations. I deem such allegations as clearly having been abandoned.

Glenn R. Lewis, an attorney and citizen of San Angelo, Texas, which is situated in the 21st Congressional District, has appeared as Amicus Curiae. His argument is in opposition to the position of plaintiffs. Although opposed by Motion to Strike filed by plaintiffs, leave was duly granted the Amicus Curiae to file his argument.

As contrasted with the findings of fact,[1-a] the evidentiary facts contained in the Opinion are stated with substantial accuracy but I will add some.

This cause being in equity, the consequences of granting or denying relief are vital to decision. The Opinion sets forth fully the consequences to plaintiffs, which I will not repeat. But, I will undertake to state the consequences to named defendants and the State of Texas, and turn first to that task.

## II. Consequences of the Majority Opinion and Command Decree

Because of my deep concern over the consequences of the action taken and in the sincere belief grave errors of law and judicial policy have been committed, but with great respect for and deference to the views of my distinguished colleagues, I have dissented to the Decree entered and Opinion filed by the Majority of this Court today.[2]

For the first time in the judicial history of the United States, a federal court holds in a case involving an attack on a state's apportionment of its congressional representatives that *"the simple constitutional fact is that* so far as (a) the standard of composition of the Congress is concerned, as distinguished perhaps from (b) the standard governing the time and circumstance permitting or requiring judicial intervention, *Members of Congress are to be elected on the basis of population* and nothing else."[3] (Emphasis added.) Thus, the Court tells the State of Texas, its Governor, Attorney General, Secretary of State, and Legislature that in apportioning the congressmen allotted the State under Federal Law, the sole guideline for the State is "population and nothing else." No prior judicial authority is cited to support this test. In fact, none exists.[4]

The congressional districts heretofore created by the Texas Legislature are found not to meet this population-only test and therefore to violate the Equal Protection Clause of the Federal Constitution, which in turn justifies, even necessitates, present judicial intervention and a present coercive judicial remedy.

Paragraph FIRST of the Decree grants declaratory relief, relief traditionally reserved by the judiciary for extraordinary occasions, and declares the present apportionment of congressional districts in Texas "unconstitutional and therefore * * * void and invalid."[5] Had the Decree been limited to granting declaratory relief, the adoption of the new population-only test would not be of such serious consequence. But when failure to meet this test is the primary reason for finding invidious discrimination and justifying judicial intervention together with the coercive relief ordered in Paragraphs SECOND and THIRD, the consequences of this error become calamitous.

Paragraph SECOND of the Decree grants another extraordinary remedy by enjoining the defendant State executives "from enforcing, applying or following said Art. 197(a)," which, again with respect, I believe to be error.[6]

---

1-a. For example, at page 17 of the Opinion it is said that all the 1957 apportionment act did was to provide Harris County an additional congressman. This conclusion of fact is in error. See page 534, this Dissent for correct statement of the effect of the 1957 act.

2. Hereinafter referred to as "the Decree" and "the Opinion," respectively.

3. The Opinion, p. 524.

4. See Section IV, this Dissent.

5. See Section V, Sub-section C, this Dissent.

6. Ibid.

Paragraph THIRD grants relief which, with deference, I find unique in the annals of federal jurisprudence, the more so because it is mounted in this delicate frame of state-federal relationships. It is not declaratory in nature. It orders official action. In my opinion, it constitutes mandatory type relief, the most extraordinary and jealously guarded remedy within the power of any court. And it is done without any pleadings on file which would justify, request, or even suggest, this character of relief; [7] without proper notice of such contemplated action having been given to the State of Texas or its said executives; without any indication whatsoever in the record that a valid apportionment act will not be in effect at the appropriate time by virtue of Paragraphs FIRST and SECOND of its Decree; and without any pending question or controversy before the Court which would make even the consideration of such a mandatory order appropriate or timely. It commands all within earshot as follows:

"*THIRD:* Pending enactment by the State of Texas of substitute legislation in the place of said Art. 197a, all Members of Congress for the State of Texas shall be nominated and elected from the State at large * * *."

I consider this command, made without precedent or authority, to be beyond the judicial power of the Court and violative of the Eleventh Amendment to the Constitution of the United States.

Undoubtedly, the underlying purpose of the Decree, so coercive in nature, is to give a "powerful cathartic" to immediate congressional reapportionment by the State of Texas, first suggested and presaged by a member of the Court in a colloquy with the Attorney General of Texas during oral argument.[8]

But I have grave misgivings that the sought result will be accomplished by this threat. As explained later, there is equally good reason to believe a consequence of this command may be to defer indefinitely reapportionment by the Legislature, a consequence contrary to the announced desires and purposes of the Opinion and Decree and of the defendant State executives, as well as of the plaintiffs.

In their pleadings and orally at trial the Governor of Texas, its Attorney General, and Secretary of State made an urgent plea to the Court [9] for a reasonable time within which to obtain more definitive guidelines from the United States Supreme Court as to the basis for constitutionally reapportioning the State into congressional districts. The Senator [10] and Legislator [11] who testified, Chairmen of the cognizant Committees of the Texas Senate and House, respectively, ratified this plea. Admittedly, these guidelines

---

7. Statements of counsel during oral argument (Transcript, p. 149, lines 8–11; Tr., p. 150, lines 19–23) concerning the suggestion of at-large elections by a member of the Court and plaintiffs' prayer for general relief are not regarded as pleadings, requests, suggestion or notice. However, it is noteworthy that in the Motion to Strike the Amicus Curiae Argument of Mr. Lewis, counsel for plaintiffs meticulously avoided any inference to any request by them for the order of at-large elections. I would infer plaintiffs do not want the credit, or liability if such should be the case, *of asking for at-large elections even in the alternative.* Their Motion to Strike merely says the declaration of the unconstitutionality of 197a would act as a "powerful cathartic * * * as

* * * suggested by the Court," and that "prospects for elections at-large in 1964 are indeed remote." The latter statement is euphoric and, I fear, misinformed.

8. Tr., p. 137, lines 20–23.

9. Tr., p. 130, line 25 and p. 131, lines 1–9.

10. State Senator Abraham Kazen of the 21st Senatorial District (Rio Grande Valley); Chairman of the Senate Committee for Legislative and Congressional Redistricting; six years prior service as a Representative and eleven in the Senate.

11. State Representative Menton J. Murray, District 39, Place 1 (Cameron County in the Rio Grande Valley); Chairman of the House Legislative and Congressional

should be received very soon in pending cases, particularly the Georgia case of Wesberry v. Vandiver, 206 F.Supp. 276 (N.D.Ga.1962) which is set down for oral argument in November 1963 and which, as the Opinion says, could be dispositive here. The Chairmen expressed a cooperative attitude on behalf of themselves, their Committees, and the Legislature toward congressional reapportionment, and expressed the opinion that, given guidelines, reapportionment would be accomplished without delay at the next Regular Session of the Legislature. Furthermore, it is commonly known that the Governor has publicly stated such reapportionment would take place not later than the next regular Legislative Session.[12] There is no dispute between the parties here as to whether or not the State should be reapportioned.

This urgent official plea is peremptorily rejected and the most coercive means within the power of the Court are used to compel immediate reapportionment, based upon the untested, and I respectfully say erroneous, guideline of "population and nothing else."

It is undisputed that an at-large election of all congressmen would violate the congressional policy manifested in 2 U.S.C.A. § 2a, as well as the Texas statutory requirement of almost one hundred years standing, that representatives be elected by districts. This national policy was emphasized by Mr. Justice Frankfurter in Colegrove v. Green, 328 U.S. 549, 553, 66 S.Ct. 1198, 1200, 90 L.Ed. 1432 (1946):

"The upshot of judicial action may defeat the vital political principle which led Congress, more than a hundred years ago, to require districting. This requirement, in the language of Chancellor Kent, 'was recommended by the wisdom and justice of giving, as far as possible, to the local subdivisions of the people of each state, a due influence in the choice of representatives, so as not to leave the aggregate minority of the people in a state, though approaching perhaps to a majority, to be wholly overpowered by the combined action of the numerical majority, without any voice whatever in the national councils.' 1 Kent, Commentaries (12th ed., 1873) *230–31, n. (c)."

This policy should be upheld, not avoided, by this federal district court.

The possible congressional underrepresentation of the 3,420,331 people of Dallas, San Antonio, Fort Worth and Houston [13] and the possible dilution of their votes in congressional elections is explained at length in the Opinion. I do not believe the posed dilution or underrepresentation to be, in fact, as serious or as certain as the numbers are presented to illustrate. As is conceded, it is difficult if not impossible to demonstrate that the votes in the underrepresented congressional districts are outnumbered by a majority of congressional representatives elected by a minority of the population.[14]

But this explanation overlooks the plight of 6,159,346 [15] people who do not live within the metropolitan areas of the four great cities but who could go virtually unrepresented for two years, and possibly longer, if at-large elections should occur.[16] I have grave concern for the consequences to all of the people of Texas if at-large elections should be held.

The Opinion correctly recognizes [17] the Court's obligation to balance the rights of the parties and the classes they repre-

---

Redistricting Committee; fifteen years continuous service in the House.

12. Statement made to Texas delegation of the Congress, Washington, D. C., October 3, 1963. Reported in the Houston Post, October 4, 1963.

13. Congressional Districts 5, 8, 12, 20 and 22.

14. The Opinion, p. 527.

15. Population of Congressional Districts 1, 2, 3, 4, 6, 7, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19 and 21.

16. Tr., p. 136, lines 22–25; p. 137, lines 1–8.

17. The Opinion, p. 513.

sent, as well as of all the people of Texas. But in its attempted balancing the Opinion does not mention the well-known historical fact, which must have been overlooked, that of the nine congressmen selected in elections at large since 1910, four have come from Dallas, two from Houston, none from Fort Worth or San Antonio, and only three from smaller cities and towns. Of the latter three, all had statewide or national reputations at the time of election.[18]

Therefore, if at-large elections are held pursuant to the Decree and if history, as usual, correctly predicts the future, not less than 16 (two-thirds of the delegation of 23) would be elected from Dallas and Houston and 7 from the remainder of the State. On the other hand, if the 7 remaining should not have attained state-wide or national prominence at the time of the election, history also shows it probable that more than 16 would be elected from Dallas and Houston.[19]

In addition to the disastrous effect at-large elections would have on areas and people located outside the great cities, it is extremely doubtful the Court's population-only test will be accepted as the last word. Realistically viewed, there is bound to be opposition from these people to reapportionment based on this test, at least until it is finally passed on by the Supreme Court of the United States.

The Opinion recognizes and then lightly dismisses the problem of obtaining reapportionment through legislative action before February 3, 1964 [20] in order to

18. I will judicially notice that nine congressmen have been elected at large from the State of Texas since 1910, at about which time the great population growth began in the cities of our State. Six of the nine were residents of either Dallas or Houston, the two largest cities in the State. The other three men, whose names are even now well-remembered, had already received statewide or national recognition when elected.

*Dallas:*

Hatton W. Sumners (63rd Congress)
Sterling P. Strong (73rd Congress)
Joseph W. Baily, Jr. (73rd Congress)
Joseph R. Pool, incumbent (88th Congress)

*Houston:*

Daniel E. Garret (63rd, 65th Congresses)
A. Jeff McLemore (64th, 65th Congresses)

*Other:*

James H. Davis, Sulphur Springs (64th Congress): Known all over the State as Cyclone Davis; nationally known Chautauqua lecturer there billed as "Texas Cyclone"; statewide candidate as a member of the Populist Party on many occasions prior to his election as Congressman-at-Large; served only one term.

George B. Terrell, Alto (73rd Congress): Prior to his election served as State Legislator and Senator, and for 11 years preceding his election as a Congressman-at-Large, served as State Commissioner of Agriculture.

Martin Dies, Jr., Lufkin (83rd–85th Congresses): Had served as Congress-man from 2nd Congressional District, 72nd through 78th Congresses (1931–1945), during which time he had been Chairman of the Un-American Activities Committee of the House of Representatives; candidate for the U. S. Senate in one prior statewide race, and son of a prominent Texas lawyer, Legislator and political figure bearing the same name.

Biographical Directory of the American Congress, 1774–1961, U. S. Government Printing Office (1961).

19. I emphasize here that no party, no person, from Dallas, Houston, any other large city or elsewhere has sought or suggested an order for elections at large. There has been *no effort* exerted by Dallas or Houston or the citizens of these great cities to obtain or gain the advantage of disproportionate representation or overrepresentation which would surely result from at-large elections. This idea of using at-large elections *as a threat to coerce reapportionment* is solely the idea of a member of this Court. The problems which so concern me are those which flow from the implementation of this idea, Paragraph THIRD of the Decree.

20. The date by which the state committees of political parties not required by law to nominate by primary election shall meet to designate their chairmen and to decide whether to nominate by convention or primary elections. Art. 13.46 V.A.T.S. The Majority considers this the deadline date. The Opinion, p. 513.

avoid elections at large.[21] But careful study reveals that time alone prohibits such a summary solution of this serious problem.

Under the Texas Constitution a reapportionment law, like any other, cannot take effect until 90 full days after adjournment of the Legislature.[22] Commencing with the deadline date of February 3, 1964 and computing backward, such an act would have to be passed on or before November 4, 1963 in order for it to be effective by the deadline date. But in order to permit defendants to attempt to obtain a stay of its execution, the Decree does not become effective until November 1, 1963. Therefore, if a stay should not be obtained by the latter date and the Governor should be disposed to attempt to obtain reapportionment through a Special Session, he and the Legislature would have only three days— Saturday November 2, Sunday November 3, and Monday November 4—for the Session to be called, convened, reapportionment adopted, and the Session adjourned. I do not believe that even the "coercive relief" conceived from the Bench and so readily administered in the Decree is powerful enough to force such action within this three-day period.

It might be said in answer by plaintiffs that reapportionment, if passed, could be done as an emergency measure, effective immediately rather than after the expiration of the 90-day period. But such suggestion would be completely unrealistic because it is well known that emergency legislation providing for immediate effectiveness is *very hard to pass,* even in the absence of controversial issues. A measure carrying such an emotionally-charged issue as reapportionment by population only would in my opinion be impossible to pass by the two-thirds majority of the House and the Senate required to make it effective immediately.[23] The possibility of obtaining the immediate legislative apportionment suggested in the last paragraph of

the Opinion is too remote to accept as an earnest suggestion.

At least one additional legislative problem is suggested by the Court's action— it may be necessary to amend the Texas Election Code in order to provide properly for the election of all congressmen in the State at large rather than by districts as provided in Article 197a.[24]

All districts are presently served by congressmen. Even if at-large elections were held, it is reasonable to assume many people in those districts would want at least the opportunity to reelect their incumbent congressmen in the at-large elections. But, it is highly unlikely the congressmen from the thinly-populated regions far removed from the metropolitan areas, and known only in their districts, could get renominated or reelected in at-large elections. If these experienced congressmen should be swept out of office in an avalanche of statewide votes, it would probably be due more to their lack of statewide reputations than to their qualifications or lack of them. The consequences, the inherent unfairness, to the people living in the present districts from not having a reasonable opportunity to have their own congressmen reelected is disturbing. And, the consequences to the entire State of Texas when the removal of these congressmen is threatened, not by the expressed will of the people of Texas through normal political action but by the practical operation of an unfortunate intervention and untimely order of a federal court, is likewise disturbing.

Election of congressmen-at-large would cause far more serious discrimination and consequences for people living outside the great metropolitan areas than is even alleged to exist presently, for today every region has substantial representation by districts. Plaintiffs only claim present serious underrepresentation in a few areas. At-large elections would leave many regions of the State of Texas and

---

21. The Opinion, p. 516.

22. Tex.Const. Art. 3, § 39.

23. Ibid.

24. See this Dissent, Section III.

·their people, practically speaking, without representation at all.

The at-large elections ordered today are just as certain to set country against city, small city against large city, economic interest against economic interest, area against area, county against county, district against district, and generally foment antagonism, as night follows day. It seems to me that common sense, appropriate perspective and a carefully weighed regard for the political rights of all of the people of Texas require that such mandatory type relief not be granted.

In evaluating what is ahead, let us assume first that the Legislature for some reason does, not reapportion and Texas congressmen are elected at large; and secondly, that it does reapportion on the basis of today's population-only test and Texas congressmen are elected from districts so reapportioned. Let us assume further that today's population-only test is stricken down by the United States Supreme Court, as in my opinion it will be. In either event, this Court would have required the State of Texas to undergo the great and unnecessary expense of a Special Session of the Legislature.

If at-large elections should be held, there would be (a) a complete disruption of congressional representation ensuing from the certain defeat of many present congressmen living outside the great cities, and (b) virtually no representation of the areas outside those cities during the period of service of congressmen-at-large, all in violation of the basic policy of the United States and Texas that congressmen be elected by districts.

On the other hand, if the Legislature should be called into Special Session and hammer out a patchwork reapportionment based on today's test of population only, congressmen would be elected from districts which again would have to be reexamined by a subsequent Legislature in the light of guidelines almost certain to be laid down soon by the Supreme Court. That reexamination would un-

doubtedly result in another reapportionment and still a different designation of districts. Meanwhile, many citizens and districts of the State would be having their votes diluted and be suffering underrepresentation, or enjoying overrepresentation, due to redistricting based on a standard announced and commanded by this federal court when the most compelling reasons required that the Court stay its own hand.

Moreover, there is presently pending before this Court a suit contesting the constitutionality of the apportionment of the Texas Legislature. If, and I am here expressing no opinion as to the merits of that case, the Legislature is determined to be unconstitutionally apportioned, this Court, by requiring the present Legislature to reapportion congressional districts without first determining the validity of the Legislature's apportionment, would have created the nonsensical situation of requiring an unrepresentative body to make a determination affecting other representation of Texas citizens.

If the injunction granted is stayed, the State of Texas could be placed in the anomalous position of electing its congressmen under a congressional districting statute declared unconstitutional by a federal court. This would certainly be an undesirable situation and would cast serious doubts upon the right of those elected to be seated in the Congress.[25]

The only possible circumstance under which the Decree would not be fraught with the gravest of consequences would be the occurrence of the following events: (1) for injunction not to be stayed, (2) for the Texas Legislature to reapportion on the basis of population only, (3) for the United States Supreme Court to declare that population only is the correct standard for reapportionment, and (4) for the Texas Legislature to be determined constitutionally apportioned. Unless all these events should occur, which is extremely doubtful, there is no end of mischief ahead.

25. See the Opinion, Footnote 34, for an expression of the same view.

**III. Absence of Necessary Parties to Grant Effective Mandatory Relief**

Paragraph THIRD of the Decree, while unclear, is in the nature of a mandamus or mandatory injunction which compels parties to perform certain acts.[26] It requires rather than prevents action, for it says "Members of Congress * * * *shall* be nominated and elected * * *." (Emphasis added.) Paragraph THIRD is not a simple declaration by the Court that the law requires an at-large election in the event the Texas Legislature should fail to reapportion. The Court was asked to make no such declaration by the complaint, the parties neither briefed nor argued the question, the Decree is not worded as a declaration of legal principles, and the plain truth is that Paragraph THIRD is not meant to declare a legal rule.[27]

Although the Paragraph is not directed against any named person or parties, it must be presumed that a court does not intentionally issue "hollow," "empty" and ineffective orders and, therefore, it must be presumed that Paragraph THIRD is intended to apply to someone. The Court has jurisdiction to order only those defendants properly before it; since Paragraph THIRD does not designate the particular defendants to whom it is to apply, it must be presumed that it is intended to apply to all of the defendants in this case. I so construe it.

Nevertheless, it would still appear that the necessary parties to make Paragraph THIRD effective are not presently or properly before the Court. The performance of tasks by numerous and varied officials is necessary to carry out an election in Texas. The issuance of injunctive orders against any of these officials could prevent the holding of an election.[28] But to command these officials and those others specified by law to hold an election in a certain way, conceding *arguendo* that this Court has the power

to do so, is quite another matter and would appear to require that this Court have jurisdiction over the persons of *all* the officials who must function in order to hold such an election.

Evidently, Paragraph THIRD orders that all members of Congress be nominated and elected at large because it was felt that at-large elections would not be the natural consequence of the injunctive and declaratory relief contained in the Decree if the Legislature fails to reapportion.[29]

The instant suit was brought against the County Judge and County Clerk of Harris County as representatives of a class consisting of all county judges and county clerks throughout the State. However, the defendant Judge and Clerk do not answer for a class, if such in fact exists, but for themselves only. These two defendants carefully point out that other county judges and county clerks may have interests adverse to theirs.

Avoiding and failing to resolve the ticklish problem whether the defendant Judge and defendant Clerk properly represent such alleged class, Footnote 4 of the Opinion states "Although the nature of their duties is such that they are proper parties with respect to elections to be held in Harris County, we need not determine whether they may be sued as representative Defendants since effective relief is available by injunctive or declaratory orders against the Governor, the Secretary of State, and the Attorney General." The Opinion therefore expressly fails to determine whether a proper class action has been brought such as would give the Court jurisdiction over all of the county judges and county clerks in the State of Texas.

The complaint in sub-paragraphs (4), (5) and (6), Paragraph II describes in detail with appropriate citations the extensive duties imposed upon the State Executive Committee Chairmen, County

---

26. See Duncan Townsite Co. v. Lane, 245 U.S. 308, 38 S.Ct. 99, 62 L.Ed. 309 (1917); The Board of Commissioners of Knox County v. Aspinwall, 24 How. 376, 65 U.S. 376, 16 L.Ed. 735 (1860).

27. Tr., p. 137, lines 13–21.

28. See Footnotes 1–4 of the Opinion.

29. See Section V, this Dissent.

Judges and County Clerks of Texas by the Election Code. In doing so, the complaint refers to decisions to be made and action to be taken by the Republican and Democratic State Executive Committees, and duties to be performed by county sheriffs, election precinct judges, and precinct and county conventions. Thus, plaintiffs point out many duties in holding elections to be performed by many people other than defendants.

Activity in preparation for biennial elections in Texas commences on the second Monday in February, the next such activity to commence February 2, 1964, at which time duties must be performed by the state committees of certain political parties. This activity continues for a period of several months and embraces numerous duties to be performed by the officials and persons mentioned in the complaint as well as commissioners' courts, district chairmen and district executive committees, county chairmen, county executive committees, and precinct chairmen, all culminating in the General Election in November. These duties are extensive and varied. The delineation of them occupies most of Volume 9 of the Annotated Civil Statutes of the State of Texas. Art. 1.01 to Art. 3158a, inclusive.

The multitudinous duties prescribed in the Texas Election Code are to be performed by the many people there designated. This Code does not authorize any defendant named in this suit or anyone else to usurp any of the duties committed to these many officials and people. But, all of these duties and people are purportedly caught up in the broad sweep of the Court's order that "All Members of Congress for the State of Texas shall be nominated and elected from the State at large." They would have to be subject to and bound by the Decree in order to accomplish the Court's command.

This Court can effectively order at-large congressional elections, if it has the power at all, only in Harris County, for it has no jurisdiction to grant mandatory type relief against the county judges and clerks of other counties.

This matter has not been briefed by the parties, argued, or otherwise presented in the adversary manner normal to a judicial proceeding. It was not, simply because plaintiffs did not pray for any such relief.

Before the defendants now subject to the Court's Decree can reasonably be held accountable for any failure to obey the command of Paragraph THIRD, all of these questions concerning parties must be determined by this Court. I assume further hearings will ensue in order to permit essential answers to these thorny problems to be found.

IV. Population-only Test—
Incorrect Guideline

Again with deference, I disagree that members of Congress are to be elected on the basis of "population and nothing else." [30] The United States Supreme Court has cautioned in MacDougall v. Green, 335 U.S. 281, 283–284, 69 S.Ct. 1, 2–3, 93 L.Ed. 3 (1948), that

"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact

30. Although the Majority states that invidious discrimination is more than mere arithmetic, nonetheless, they establish the strict population standard quoted on page 519 of this Dissent as the only valid basis for the composition of congressional districts.

that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. Colegrove v. Green, 328 U.S. 549 [66 S.Ct. 1198, 90 L.Ed. 1432] and Colegrove v. Barrett, 330 U.S. 804 [67 S.Ct. 973, 91 L.Ed. 1262]." [31]

The Majority bases its position solely on Article I, Section 2 and Amendment XIV, Section 2 of the United States Constitution, which merely say that the number of congressmen allotted to each state shall be based on population.[32] Article I, Section 4 of the Constitution provides that "The * * * Manner of holding Elections for * * * Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations * * *." Nothing in the Constitution or statutes of the State of Texas requires congressmen to be elected from districts based upon population alone.[33] From 1872 until 1929, Congress required elections by districts based in part upon population.[34] The omission of that requirement from the statutes after 1929 is considered by the Majority to be inconsequential. But, al-

though not decisive, that omission must indicate an intention on the part of Congress that population should no longer be such an important factor, for the requirement of districting based partly on population had been dominant in prior enactments.

The mere fact that the Constitution requires that the number of congressmen allotted to each state be based on population does not command that each state use population as the sole basis for the delineation of its congressional districts.[35] It does not require a one person—one vote test. The framers of the Constitution, disregarding mass majority rule and recognizing the necessity of representation of particular interests, allotted two senators to each state, regardless of size or population. If the different interests in a state are entitled to representation in Congress, since United States senators are elected at large, it will have to be through congressmen from districts based on other factors as well as population. I feel that particular interests in a state are entitled to representation in Congress and especially so in Texas with its large geographic area, its diversity of vocations, industries and other interests, as well as its unusually uneven distribution of population.[36]

31. This view was manifested earlier in Colegrove v. Green, 328 U.S. 549, 66 S. Ct. 1198, 90 L.Ed. 1432 (1946), and Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131 (1932), cases specifically involving equality of population as a standard for *congressional* districting.

32. See Footnote 25 of the Opinion, and accompanying text.

33. See Footnote 5 of the Opinion.

34. Beginning in 1842, Congress passed a series of statutes prescribing standards for congressional districts. Act of June 25, 1842, ch. 47, § 2, 5 Stat. 491 (districts of contiguous territory) ; Act of Feb. 2, 1872, ch. 11, § 2, 17 Stat. 28 (contiguous territory containing an equal number of inhabitants as nearly as practicable); Act of Feb. 25, 1882, ch. 20, § 3, 22 Stat. 6 (same); Act of Feb. 7, 1891, ch. 116, § 3, 26 Stat. 735 (same) ; Act of Jan. 16, 1901, ch. 93, § 3, 31 Stat. 734 (contiguous and compact territory, equal

number of inhabitants); Act of Aug. 8, 1911, ch. 5, § 3, 37 Stat. 14. The 1911 act required that districts be "composed of a contiguous and compact territory * * * containing as nearly as practicable an equal number of inhabitants." These requirements expired with the passage of the 1929 apportionment act, 46 Stat. 26, as amended, 2 U.S.C.A. § 2a (1958). See Wood v. Broom, 287 U.S. 1, 8, 53 S.Ct. 1, 77 L.Ed. 131 (1932). No subsequent legislation requiring equal congressional districts has been enacted.

35. See The Federalist, Nos. 54, 56 (Madison).

36. It is well known that Texas contains 254 counties, the largest in population being Harris with 1,243,158 people and the smallest, Loving with 226 people. The largest county in area is Brewster with 6,208 square miles and the smallest, Rockwall with 147 square miles. Texas measures 801 miles from north to south

Throughout American history, the principle of numerically equal representation of qualified voters has been only one among numerous relevant considerations. The principle has often been modified so that not only people, but interests, groups and regions have been represented. In a diverse, federated country, extended over a continent, organized as a representative, not a town-meeting democracy, we strive for a responsive government which reflects the electorate and is at the same time stable and effective.[37]

The Majority cites no Supreme Court authority for its postulated population-only guideline. Certainly, Baker v. Carr provides no comfort. Mr. Justice Frankfurter, dissenting, states that apportionment involves "considerations of geography, demography, electoral convenience, economic and social cohesions or divergencies among particular local groups, communications, the practical effects of political institutions like the lobby and the city machine, ancient traditions and ties of settled usage, respect for proven incumbents of long experience and senior status, mathematical mechanics, censuses compiling relevant data, and a host of others." 369 U.S. at 323, 82 S.Ct. at 767, 7 L.Ed.2d 663.

The majority opinion in Baker v. Carr does not lay down an equal-population principle.[38] To the contrary, it states that principles of the Equal Protection Clause are to be applied, viz., whether there is a rational basis for representation, whether it is applied consistently, whether the basis although rational and consistently applied is one the state could legitimately adopt, etc.

No support is provided the Majority's position by cases prior to Baker v. Carr. The Supreme Court in Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131

(1932), held that the 1929 congressional apportionment act [39] did away with the requirement of the 1911 act [40] that equality of population be a dominant factor in the composition of congressional districts. The majority opinion in Colegrove v. Green, supra, said the Court could have decided that case on the basis of Wood v. Broom.

The only pronouncement by the Supreme Court on this matter since Baker v. Carr does not bolster the Majority's position. In Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed. 821 (1963), the Court invalidated Georgia's county unit system as a basis for counting votes in a Democratic primary for nomination of statewide offices on the ground that there can be no weighting in counting an individual's vote. But the Court took great pains to explain that

"This case, unlike Baker v. Carr, supra, *does not involve* a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen either for the State Legislature or for the Federal House of Representatives. \* \* \* *Nor does the question here have anything to do with the composition of the* state or *federal legislature*. And we intimate no opinion on the constitutional phases of that problem beyond what we said in Baker v. Carr, supra. *The present case is only a voting case.* \* \* \* *Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote* \* \* \*." (Emphasis added.)

In my opinion, this careful delimitation by the Supreme Court of the effect of its

---

and 773 miles from east to west. 1961–1962 Texas Almanac 44.

37. See Bickel, The Durability of Colegrove v. Green, 72 Yale L.J. 39 (1962).

38. See the concurring opinion of Mr. Justice Stewart, at p. 265, 82 S.Ct. at pp.

736–737, 7 L.Ed.2d 663, quoted at page 535, this Dissent.

39. 46 Stat. 26, as amended 2 U.S.C.A. § 2a (1958).

40. 37 Stat. 14 (1911).

ruling here may well be a harbinger of the Court's ultimate decision that population alone is not the proper standard.

Several post-Baker v. Carr cases have held that population disparity can be of sufficient magnitude to make out a *prima facie* case of invidious discrimination.[41]

However, they further hold that this prima facie case can be rebutted by the demonstration of some rational basis for the disparity.[42] This is a long way from holding that population is the sole basis for congressional districting, and none of the congressional redistricting cases has so held.[43]

41. Lisco v. McNichols, 208 F.Supp. 471 (D.Colo.1962); Mann v. Davis, 213 F. Supp. 577 (E.D.Va.1962); Moss v. Burkhard, 207 F.Supp. 885 (W.D.Okl.1962).

42. With respect to the prima facie case claimed by plaintiffs, their own evidence as to the history of reapportionment, population densities, counties, distances and similar proof, together with what the Court judicially knows, rebut the prima facie case. The evidence of defendants served also to rebut such presumption.

43. Clark v. Carter, 218 F.Supp. 448, 451 (E.D.Ky.1963), "That the Equal Protection Clause of the Constitution does not deny a State, in the establishment of Congressional Districts, the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses seems so thoroughly established by the decisions of the Supreme Court as to be no longer open to dispute.";

Thigpen v. Meyers, 211 F.Supp. 826, 829 (W.D.Wash.1962), "The Constitution and existing laws of the United States do not require congressional apportionment on the basis of population, Wood v. Broom * * *.";

Wesberry v. Vandiver, 206 F.Supp. 276, 282 (N.D.Ga.1962), "We would apply the test for invidious discrimination by considering all relevant factors, including a determination of rationality of state policy behind the statutory system, arbitrariness, whether the system has a historical basis in our political institutions, together with the presence or absence of political remedy.";

Wisconsin v. Zimmerman, 209 F.Supp. 183, 187 (W.D.Wis.1962), "The equal protection clause of the Fourteenth Amendment to the United States Constitution does not require that legislative and congressional districts be precisely equal in population.";

Lund v. Mathas, 145 So.2d 871 (Fla. Sup.Ct.1962), "Neither the Federal nor State Constitutions, nor the Federal nor State statutes, require that the Florida Legislature apportion Congressional districts upon the basis of numerical equality. * * * Population is one of several important factors in apportionment."

Although Wright v. Rockefeller, 211 F. Supp. 460 (S.D.N.Y.1962), and Honeywood v. Rockefeller, 214 F.Supp. 897 (E. D.N.Y.1963) touch on congressional districting, they are essentially racial and political gerrymandering cases.

An examination of those cases cited in the Opinion at Footnote 24 as articulating an invidious discrimination test indicates that other factors as well as population are to be considered. Sims v. Frink, 208 F.Supp. 431, 436–437 (M.D. Ala.1962), "Judge Bell [in Sanders v. Gray, 203 F.Supp. 158, 168–170 (N.D. Ga.1962)] continued to formuate a test for invidiousness on a consideration of all relevant factors such as rationality or irrationality of state policy, whether or not the system is arbitrary, whether or not the system has a historical basis in our political institutions—federal or state, the presence or absence of political remedy, and the delicate relationship between the federal and state governments under the Constitution.";

Toombs v. Fortson, 205 F.Supp. 248, 254, et seq. (N.D.Ga.1962), "Unlike per se invidiousness, springing from discrimination based on race, creed or color, we must here deal with discrimination not so infected, but arising out of a state legislative classification diffusing * * * political strength. * * *

* * * * *

"'* * * [W]e make the test [of invidious discrimination] on a consideration of all relevant factors * * *.'"

The invidious discrimination test was not stated by the majority in Baker v. Carr, but was set forth by Mr. Justice Douglas in his concurring opinion in that case which states "The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.' See Skinner v. Oklahoma, 316 U.S. 535, 541 [62 S.Ct. 1110, 86 L.Ed. 1655]. Universal equality is not the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co., 348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563], 'The prohibition of

### V. Jurisdiction of the Court

In any matter, a court is bound to weigh carefully the propriety of its Order; in this matter, that duty rests upon the Court a thousandfold. This Court, an arm of the national government created by the Constitution, is a court of limited jurisdiction; its judicial power is limited to that which Congress has granted it in accordance with the Constitution.[44] The subject matter here dealt with is expressly reserved to the states in that same Constitution and traditionally regarded by the courts to be the sole prerogative of the states, except to a very limited degree.

Jurisdiction here concerns (a) the subject matter, as well as (b) the relief or remedy (1) sought in plaintiffs' pleadings, and (2) granted plaintiffs but not sought in their pleadings. Clearly allied are those questions addressed to the sound discretion of the Court involving the appropriateness of taking or denying jurisdiction.

What, then, is the judicial authority with which the Court is clothed in this matter?

### A. Jurisdiction of subject matter and justiciability.

As the Opinion says, subject matter jurisdiction is closely related to justiciability. With respect to each, the Opinion; Wesberry v. Vandiver, 206 F.Supp. 276 (N.D.Ga.1962); Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946); Baker v. Carr, supra, cover the full spectrum of the divergent views on the subject. It is inconceivable that any remaining doubt in this regard will not be resolved by the Supreme Court when it decides Wesberry. For the purposes of this Dissent, I assume subject matter jurisdiction to exist and that the federal constitutional question at issue here is justiciable.

### B. Jurisdiction to give requested and granted relief.

In their pleadings plaintiffs pray for an order reapportioning the State in the event the Legislature does not adopt a constitutional reapportionment act by July 1, 1963. Plaintiffs' request for this relief was not urged at trial or in briefs. Therefore, I express no opinion here as to its present status or as to the Court's jurisdiction to enter such an order, and pass to consideration of the relief granted in Paragraph THIRD of the Decree.

The Eleventh Amendment, as interpreted by the Supreme Court,[45] prohibits suit in federal court against a state by one of its citizens in the absence of waiver by the state of its immunity. But the Supreme Court in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) held the federal courts had jurisdiction of a suit against an officer of a state, normally considered suit against the state and prohibited,[46] to enjoin his enforcing a state statute in violation of the Fourteenth Amendment. To so hold, the Court reasoned that a state could not authorize its officer to act unconstitutionally and that the officer was therefore before the Court as an individual who could be prevented by injunction from enforcing the unconstitutional statute.

The very statute which confers jurisdiction upon this special three-judge court, 28 U.S.C.A. § 2281 (1950), was the result of an attempt by Congress to lessen public resentment to the effect of the decision in Ex parte Young.[47]

On what basis, then, may the Court order that at-large elections shall be held "[p]ending enactment of substitute legislation in place of said Art. 197a?"

---

the Equal Protection Clause goes no further than the invidious discrimination.'" 369 U.S. at 244–245, 82 S.Ct. at 724–725, 7 L.Ed.2d 663.

44. 1 Moore, Federal Practice 607–08 (1961).

45. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

46. Governor of Georgia v. Madrazo, 1 Pet. 110, 122–123, 26 U.S. 110, 122–123, 7 L. Ed. 73 (1828).

47. Wright, Federal Courts 162 (1963) [citing 1910, 42 Cong.Rec. 4847, 4853].

Assuming only for the moment that all parties having the authority to carry out such a decree are before the Court, to order them to hold at-large elections is a far cry from preventing them from enforcing an unconstitutional statute. To force officials of the State of Texas to hold at-large elections is to exercise jurisdiction over the State government, which is prohibited by the Eleventh Amendment, even under Ex parte Young, unless the Majority finds that under the circumstances in this case and in the absence of a new apportionment, *to do anything other than* hold at-large elections would be unconstitutional,[48] or that there is a controlling statute placing such a duty on defendants. So long as the State has any other constitutional alternative, the Court is overstepping its jurisdiction.[49]

But the Opinion indicates no consideration has been given the problem. There has been no holding by the Supreme Court on the question [50] and there is no clearly discernible constitutional or statutory mandate.[51]

The State of Texas has not in any way waived its immunity, either inherent in state sovereignty or existing by virtue of the Eleventh Amendment, to suit in this Court by these plaintiffs. This Court has never obtained jurisdiction over the State of Texas; its jurisdiction is strictly limited to that imparted by virtue of Ex parte Young—to prevent by injunc-

tion the enforcing of an unconstitutional State statute by officials deemed to have left the pale of State immunity by virtue of preparing to act unconstitutionally.

For the foregoing reasons it is my opinion this Court does not have jurisdiction in this case to command the defendants through mandatory type relief to conduct elections for congressmen in 1964 at large.

### C. Inappropriateness of judicial intervention.

In Sections IV and V of the Opinion, the Majority weigh the admittedly difficult judicial policy questions of appropriateness of judicial intervention and of granting coercive judicial relief. Being persuaded that an improper result obtained, I turn now to those policy questions.

In cases involving federal-state conflicts the federal courts have traditionally exercised commendable restraint, avoiding hasty or unnecessary action where possible. That restraint has taken many forms, and has often been inadequately labeled. In those cases involving legislative and congressional apportionment, both before and after Baker v. Carr, the phrase "want of equity" has commonly been used to sustain dismissal or refusal to grant immediate relief. Of course, in those cases declaratory judgments and injunctions were almost always sought, and the granting of either was clearly within the sound discretion

---

48. But even in such case, the Decree should be directed at defendants, enjoining them from holding elections in any way other than at large. The Decree apparently disregards the Eleventh Amendment and orders all within ear-shot.

49. Ex parte Young, 209 U.S. 123, 158, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908), "There is no doubt that the court cannot control the exercise of the discretion of an officer."

50. The closest thing to that is the language of Mr. Justice Frankfurter in Colegrove v. Green, 328 U.S. 549, 553, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), stating that the result of holding statute unconstitutional would be at-large election if

legislature did not act. That was clearly not the central question before the Court, and is unexplained dicta.

51. 2 U.S.C.A. § 2a (1963 Supp.) seems to require districting except in those special circumstances listed. The situation here is clearly not included. The Constitution expressly reserves to the state legislatures the power to determine methods of election, although Congress may alter the states' regulations. Art. 1, § 2, cl. 1. Nowhere is it said that at-large elections are required in the absence of other methods. Nowhere is there the slightest indication that the federal courts have the authority to decree methods of election for representatives.

of the courts.[52] Thus, whether the traditional restraint involves something more than "equity" jurisdiction, as it probably does, is only of academic interest in this kind of case. Mr. Justice Frankfurter was content to call attention to the Court's equity jurisdiction in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941), where, reversing the granting of a hasty injunction against enforcement of an allegedly unconstitutional order of the Texas Railroad Commission, he explained that

> "[t]he history of equity jurisdiction is the history of regard for public consequences in employing the extraordinary remedy of the injunction. There have been as many and as variegated applications of this supple principle as the situations that have brought it into play."

In this case, also, declaratory and injunctive relief is requested by plaintiffs, and this Court is in the posture of a court of equity.

Prior cases involving congressional districting, likewise in equity, uniformly evince the exercise of judicial restraint and refusal to act precipitously in this area, usually by dismissal or refusal to act without having first given the state legislature an opportunity to do so. Favoring dismissal for want of equity were four justices in Wood v. Broom, supra, where the remainder of the Court reached the same result by holding that congressional districts of equal size were no longer required after the 1929 statute had not reenacted the prior requirement to that effect.[53]

The majority in Colegrove v. Green, supra, speaking through Mr. Justice Frankfurter, expressed agreement with the four concurring justices in Wood v. Broom and would have dismissed the case for want of equity had they not been persuaded of its nonjusticiability. The concurring and pivotal position of Mr. Justice Rutledge in Colegrove was based completely on a dismissal for want of equity. If there is any life remaining in Colegrove, and apparently there is, for the Court in Baker v. Carr took great pains to distinguish the case, it clearly stands as authority for dismissal for a want of equity.[54]

Post-Baker v. Carr reapportionment cases have made use of the equitable abstention principle.[55] The most prominent is Wesberry v. Vandiver, 206 F.Supp. 276 (N.D.Ga.1962), which I interpret as dismissing for want of equity.[56]

Chief Judge Tuttle, dissenting in Wesberry, would not have dismissed; he would have withheld action, giving the newly apportioned Georgia Legislature an opportunity to redistrict. I have found no case in which a court has declared a state statute creating a con-

52. "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S. Ct. 641, 644, 92 L.Ed. 784 (1948).

53. See Section IV, this Dissent.

54. Mr. Justice Brennan says in Baker v. Carr, "Indeed, the refusal to award relief in Colegrove resulted only from the controlling view of a want of equity. * * * MacDougall v. Green, 335 U.S. 281 [69 S.Ct. 1, 93 L.Ed. 3], held only that in that case equity would not act to void the State's requirement that there be at least a minimum of support for nominees for state-wide office, over at least a minimal area of the State." 369 U.S. at 234–235, 82 S.Ct. at 719–720, 7 L.Ed. 2d 663.

55. See Davis v. Synhorst, 217 F.Supp. 492 (S.D.Iowa 1963) ; Lisco v. McNichols, 208 F.Supp. 471 (D.Colo.1962); Thigpen v. Meyers, 211 F.Supp. 826 (W.D.Wash. 1962); Wisconsin v. Zimmerman, 209 F. Supp. 183 (W.D.Wis.1962); Lund v. Mathas, 145 So.2d 871 (Fla.Sup.Ct.1962).

56. The Opinion may be correct in its conclusion that a case containing those factors listed by the majority in Wesberry as requiring dismissal could never be heard on its merits. One of those factors, the presence of a political question involving a coordinate branch of the federal government, was said by Mr. Justice Brennan in the majority opinion in Baker v. Carr to be indicative of a nonjusticiable political question. 369 U.S. at 210, 82 S.Ct. at 706, 7 L.Ed.2d 663.

gressional district unconstitutional and enjoined its enforcement before giving the state legislature a reasonable opportunity to act.[57] In the cases following Baker v. Carr, the courts have shown great patience with state legislative processes, even when presented with insupportable apportionments.

The reasons given by Mr. Justice Rutledge in his concurring opinion in Colegrove v. Green, supra, for dismissal for want of equity are pertinent to the present case. He explains that a court should avoid decision upon grave constitutional questions, especially when such decision may bring the court's function into clash with the political departments of the government, if any tenable alternative ground for the disposition of the controversy is presented. He emphasized that the controversy in that case, the same as involved in this case, was of so delicate a character that jurisdiction should be exercised only in the most compelling circumstances.

Those factors in the Wesberry case which persuaded the majority to dismiss for a want of equity are also present in this case.[58] In Wesberry the state legislature had previously been reapportioned and the possibility of relief forthcoming from such a properly apportioned body was of great import;[59] whereas, in the instant case there is presently before this Court, in addition to this case, a suit challenging the validity of the apportionment of the Texas Legislature.

A factor not present in other cases dismissing for want of equity but weighing in favor of refraining from action in this case is that presently pending before the Supreme Court are several cases involving legislative and congressional apportionments.[60] The Supreme Court in those cases could well establish what it did not establish in Baker v. Carr, guidelines for apportionment. Such guidelines would provide invaluable assistance to the Texas Legislature in its reapportionment efforts and to this Court in testing the validity of the fruits of such efforts. Therefore, this Court should refrain from acting at least until the Supreme Court has acted in the apportionment cases presently pending before it.

Of course, the undesirable consequences discussed in Section II of this Dissent, which may result from the precipitous action taken today, are other reasons why this Court should not grant the decreed relief.

Finally, and most emphatically, the Texas Legislature should be given the opportunity to solve this basically local problem without coercion from the federal courts.[61]

57. See Thigpen v. Meyers, 211 F.Supp. 826 (W.D.Wash.1962); Wisconsin v. Zimmerman, 209 F.Supp. 183 (W.D.Wis. 1962); Clark v. Carter, 218 F.Supp. 448 (E.D.Ky.1963); Wright v. Rockefeller, 211 F.Supp. 460 (S.D.N.Y.1962); Honeywood v. Rockefeller, 214 F.Supp. 897 (S.D.N.Y.1962); Lund v. Mathas, 145 So.2d 871, (Fla.Sup.Ct.1962).

58. They are: a political question involving a coordinate branch of the federal government; a political question posing a delicate problem difficult of solution without depriving others of the right to vote by districts unless the Court itself redistricts the state; the possibility of relief from the state legislature; the possibility of relief from Congress.

59. Chief Judge Tuttle places great emphasis upon this factor, for he states, "In Baker v. Carr the Supreme Court stressed as one of the factors which it considered as warranting a federal court's granting relief in a case of legislative malapportionment within a state the absence of any practical means by which the plaintiffs might hope to obtain relief at the hands of the state legislature." 206 F.Supp. at 286.

60. See the Opinion, Footnote 6.

61. Congressman Emanuel Celler of New York, in a hearing before the Committee on the Judiciary, House of Representatives, recently stated that it was impracticable to draw congressional district lines in Washington. He stated that the economic and social interests of an area, its topography and geography, means of transportation, the desires of the inhabitants as well as their elected representatives, and the political factors should all be considered, and that the state legislatures are far better equipped to determine and evaluate those factors than

I agree with the position of Chief Judge Tuttle [62] that "it is a part of judicial statesmanship for this Court to refrain from stepping into this particular area until after the Legislature of the State * * * has had a *fair opportunity* to correct the present abuses." (Emphasis added.) The Texas Legislature should not be forced in panic and without reflection to create the semblance of any type of congressional districting based solely on population in order to prevent an injunction from destroying the right of election of congressmen by districts. I might be of a different persuasion if the Texas Legislature had been lax or derelict in redistricting, but such is not the case.

Let us examine what occurred in the past and determine whether the Texas Legislature is capable of handling this problem. In 1957, long before Baker v. Carr, the Texas Legislature, in the most recent reapportionment, gave an additional congressman to Houston and changed eight of the remaining twenty districts so that they were much closer to the State average. At that time the population disparity between the 4th and 5th Congressional Districts was not nearly so great as it is today.[63] Furthermore, the Texas Legislature was not then acting on the assumption that equal population was the sole factor to be considered.[64]

Baker v. Carr was not decided until March 26, 1962. There was no Regular Session of the Legislature in 1962. The House of Representatives and the Senate each passed a redistricting bill at the 1963 Session of the Legislature, but were unable to reconcile their differences before the end of the Session. It was a mere year since Baker v. Carr, and there was no pending court action compelling a redistricting when the bills were initiated.[65] The Legislature was acting out of moral compulsion and its disposition to do its official duty. Senator Abraham Kazen and Representative Menton Murray testified that the Texas Legislature had recognized the inequity in the 5th Congressional District (Dallas) and that it would be rectified, but that the Legislature, desiring to do more than merely remedy the worst situation, had undertaken the much more difficult task of properly redistricting the entire State.

These witnesses explained that countless factors had to be considered, making the rearranging of congressional districts no mean task. But each House did pass a redistricting bill. Although the Majority feel that the bills effected inconsequential change [66] and have seen fit to find them unconstitutional as measured by the population-only test, the Majority fail to recognize that *no precedent* establishing population as the sole standard existed during the deliberations by the Legislature. Population-only was never held to be the sole test until today.

The Texas Legislature has indicated by its actions for the past ninety years a reasonable attitude toward reapportioning. That attitude has not changed; as shown by statements of the Governor and the testimony of Representative Murray and Senator Kazen, it still exists.

On the other hand, favoring plaintiffs' position is the possibility that an exercise of greater restraint by this Court might delay the benefits of reapportionment until the 1966 congressional elections.

either Congress or any national agency it might designate to do so. See Footnote 6, Wesberry v. Vandiver, 206 F. Supp. at 285.

62. Dissenting opinion, Wesberry v. Vandiver, supra, 206 F.Supp. at 286.

63. 1950 Census: District 4—227,735; District 5—614,799.

64. See Dissent, Section IV, for the view that population should not be the sole factor.

65. The House Bill was introduced March 7, 1963; the House passed H.B. 871 and sent it to the Senate on April 4, 1963. The instant case was filed on April 23, 1963. The Senate's bill was passed on May 22, 1963.

66. They did, however, rectify the 4th–5th Congressional District inequity. The 5th Congressional District (Dallas) was split into two districts (5th with 512,973 people and 23rd with 438,554 people) and the present 4th District was abolished.

Plaintiffs say they are entitled to equal protection now. But, as Mr. Justice Rutledge stated in Colegrove v. Green, "The right here is not absolute. And the cure sought may be worse than the disease." [67]

The constitutional right here involved does not pertain to life or liberty and is not one calling for immediate attention to prevent permanent, irreparable harm. The Opinion points out very well the limited extent of harm that may possibly be suffered by the plaintiffs.[68]

In the "School Segregation Cases" which the courts have characterized as involving classic invidious discrimination (being based on race, creed or color), the courts have delayed the full realization of constitutional rights to many people by the "grade a year plans," simply because other factors outweighed the immediate realization of all these rights for all these people.

It is important here that plaintiffs *do* have representation; they only claim it to be insufficient. But the action taken by the Majority in response to plaintiffs' plea may cause many Texas citizens to be completely without effective representation. A proper weighing of the equities in this case and a sober consideration of the grave consequences of unnecessary, precipitous action lead me inescapably to the conclusion that this Court should have refrained from action in order to provide the Texas Legislature sufficient time to approach the problem in a calm and orderly manner.

D. Inappropriateness of coercive judicial relief.

Having determined judicial intervention, the Opinion proceeds to discuss the appropriateness of granting coercive judicial relief.[69] With deference, the argument made in support of granting such relief appears to be inconsistent and contains many misconceptions of the legislative process.

Throughout, the Opinion affirms the good faith of the Texas Legislature and its spokesmen. But in the granting of coercive relief is contained an implication that the Legislature has been less than diligent. The Majority says that the Texas Legislature, composed of laymen as well as lawyers, should have understood the *full reach* of Baker v. Carr in the light of "contemporary constitutional development," and presumably with the benefit of the teachings of Baker v. Carr, that it should have immediately proceeded to reapportion Texas. But what guidance was Baker v. Carr? Mr. Justice Stewart carefully explains in his concurring opinion that

"The Court today decides three things and no more: '(a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) * * * that the appellants have standing to challenge the Tennessee apportionment statutes.' * * *

* * * * * *

" * * * [T]he Court most assuredly does not decide the question, 'may a State weight the vote of one county or one district more heavily than it weights the vote in another?' " 369 U.S. at 265, 82 S.Ct. at 736–737, 7 L.Ed.2d 663.

I must confess that I do not understand how any reasonable criticism can be leveled at the Legislature for not having "taken off" from this highly controversial decision which did not involve congressional redistricting and which did nothing more than was pointed out by Mr. Justice Stewart.

Texas has been reapportioned many times, as noted in the Opinion. History shows Texas to have been duly attentive to its duty of reapportionment. Furthermore, the record here shows that if the present Texas apportionment is not acceptable, it is only because of gradual population shifts since the 1933 apportionment act. In other words, the appor-

---

67. 328 U.S. at 566, 66 S.Ct. at 1209, 90 L. Ed. 1432.

68. The Opinion, p. 513.

69. The Opinion, Section V, p. 512.

tionment now in effect was constitutional at the time it was enacted, as admitted by plaintiffs. Only through subsequent shifts in population do plaintiffs claim it has become unconstitutional.

The Majority's argument that the Texas Legislature should be able to reapportion now because it has done so in the past begs the question. Never before has the Legislature been subject to the vigilance of the courts without having been authoritatively told what standard would be used to measure its action.

The Opinion chides the Texas Legislature for the manner in which it held hearings on proposed reapportionment acts during the last Regular Session, commenting that no assistance was sought from experts on government. But the record shows hearings were held after proper notice and that the other usual procedures were followed.

The Opinion criticizes the Governor of Texas for not convening a Special Session of the Legislature to reapportion, since this suit was pending when the Legislature adjourned on May 24, 1962, without adopting a reapportionment. But this attitude fails to take into consideration one of the oldest concepts of proper deference between the legislative and the judicial departments, whether at the federal, state, or state-federal level. The judiciary does not intervene to pass upon pending legislation and, by the same token, legislative bodies do not usually legislate on matters pending before the courts before receiving the final decision of the courts. For these very reasons it would have been unwise for the Governor to call the Legislature into Special Session during the brief period between May 24, 1963, the end of the Regular Session, and the trial of this cause, then on file, which commenced pre-trial on

June 26, resumed pre-trial on September 9, and proceeded to trial on September 23, 1963. That the Texas Legislature should not have reapportioned with this lawsuit pending is demonstrated by the fact that the Court today has adopted a new, unique and never-before-enunciated test for reapportionment, the population-only test.

For all of the reasons set forth in this Dissent, I consider it inappropriate for the Court to grant the coercive judicial relief contained in Paragraph THIRD of the Decree.

### Conclusion

As to the respective parties and issues, based upon the pleadings and several motions before the Court, I feel the Court should enter a decree along the following lines:

(a) As to defendant Peter O'Donnell, Jr., Chairman of the State Republican Executive Committee, in view of his answer admitting each and every allegation in the complaint and consenting to the relief prayed for, I would leave the case pending on the docket at least until the United States Supreme Court hands down its opinion in Wesberry v. Vandiver, supra.

(b) As to the County Judge and County Clerk of Harris County who pray that the Court grant jurisdiction and declare the rights and duties of the parties, I would leave the case pending for the period mentioned in sub-paragraph (a) next above.

(c) As to the defendant Governor, Attorney General and Secretary of State of the State of Texas, I would dismiss without prejudice to the plaintiffs to refile their complaint if they should so elect after the Texas Legislature has next met in Regular Session.